**UNITED STATES of America,**

v.

**Alphonso Michael ESPY, Defendant.**

**Criminal Action No. 97–0335 (RMU).**

United States District Court,
District of Columbia.

Dec. 23, 1997.

William Francis Fahey, Office of Independent Counsel, Alexandria, VA, for U.S.

Reid Henry Weingarten, Steptoe & Johnson, L.L.P., Washington, DC, Theodore V. Wells, Lowenstein, Sandler, Brochin, Kohl, Fisher & Boylan, Roseland, NJ, Charles J. Ogletree, Jr., Cambridge, MA, for Defendant.

### OMNIBUS OPINION AND ORDER

URBINA, District Judge.

Upon consideration of the parties' submissions and the relevant law, the court rules on the 13 pending motions as follows:

#### Part A [1]

I. Motion to Dismiss Counts 1–7 and 9–12: **Denied.**
II. Motion to Dismiss Counts 9–12: **Denied.**
III. Motion to Dismiss Counts 13–25: **Denied.**
IV. Motion to Dismiss Counts 14, 20, 23: **Denied.**
V. Motion to Dismiss Counts 29–33: **Denied.**

#### Part B

VI. Motion to Dismiss all Counts of the Indictment as Duplicitous: **Denied.**
VII. Motion to Dismiss the Indictment for Defects in the Institution of the Prosecution: **Denied.**
VIII. Motion for a Bill of Particulars: **Granted in Part; Denied in Part.**
IX. Motion to Strike Surplusage: **Granted in Part; Denied in Part.**
X. Motion to Dismiss Count 35: **Denied.**

#### Part C

XI. Motion to Dismiss Counts 26–28: **Granted.**
XII. Motion to Dismiss Count 39: **Granted.**

### PART A

Independent counsel, appointed to investigate the defendant's alleged violations of federal criminal laws, brought various charges based on the defendant's acceptance of improper gifts from organizations or individuals regulated by the Department of Agriculture while he was Secretary of Agriculture. The indictment, in part, charges the defendant with several crimes related to alleged gratuities violations including: Gratuity to Public Official, 18 U.S.C. § 201(c)(1)(B), Mail and Wire Fraud, 18 U.S.C. §§ 1341, 1343, 1346, and the Travel Act, 18 U.S.C. § 1952. This matter comes before the court upon the defendant's motions to dismiss several counts of the indictment relating to the above-mentioned charges for failure to state an offense pursuant to Federal Rule of Criminal Procedure 12(b)(2). Upon consideration of the parties' submissions and the relevant law the court denies these motions.

### Introduction

**Procedural Background**

On September 9, 1994, the Special Division of the Court of Appeals for the District of Columbia Circuit ordered the appointment of Donald C. Smaltz as Independent Counsel ("IC") to investigate whether the then-Secretary of Agriculture, Alphonso Michael Espy, had committed a violation of any criminal law, other than a Class B or C misdemeanor or infraction, relating in any way to the acceptance of gifts by him from organizations or individuals with business pending before the Department of Agriculture. *In re Espy*, Special Div. No. 94–2 (D.C.Cir.Sp.Div. Sept. 9, 1994). On August 27, 1997, a grand jury indicted the defendant on 39 counts alleging unlawful activities occurring during his tenure as Secretary of Agriculture.

Counts 1 through 7 of the indictment [2] charge the defendant with Wire Fraud, 18

---

1. Defendant may re-bring motions resolved in Part A if timely justified by the decision in *United States v. Sun–Diamond*, Cr. Action No. 97–3072 (D.C.Cir.1997), now pending before the United States Court of Appeals for the District of Columbia Circuit.

2. All dates in the indictment are "on or about" and all values are approximate.

U.S.C. §§ 1343, 1346, based on activities arising from the defendant's alleged receipt of illegal gratuities from certain sources. Specifically, the indictment alleges in Counts 1 and 2 that the defendant effected telephone communications on May 4 and 12, 1993 between Washington, D.C., and Springdale, Arkansas, to accept an invitation to a weekend birthday party hosted by Tyson Foods, Inc. ("Tyson"); in Count 3 effected telephone communications on June 17, 1993 from Washington, D.C., to Chicago, Illinois, to solicit 1993 NBA Championship tickets from the Quaker Oats Company ("Quaker Oats"); in Count 4 sent facsimile communications on January 18, 1994 from Dallas, Texas, to Temple, Texas, and Washington, D.C., to report results of a meeting with a Department of Agriculture Inspector General in Dallas, Texas; in Count 5 received facsimile communications on January 27, 1994 from the President of Oglethorpe Power Company ("Oglethorpe") in Tucker, Georgia, confirming a meeting at Oglethorpe headquarters; in Count 6 effected telephone communications on January 27, 1994 in Washington, D.C., and Atlanta, Georgia, to request 1994 Super Bowl tickets from the Fernbank Museum ("Fernbank") and; in Count 7 received facsimile communications from the President of Oglethorpe in Tucker, Georgia, requesting that the defendant elevate to other government officials Oglethorpe's proposal to prepay REA bonds after the proposal was rejected by the administering federal bank.

Counts 8 through 12 of the indictment charge the defendant with Mail Fraud, 18 U.S.C. §§ 1341, 1346, based on (i) the defendant's scheme to obtain money and property by means of fraudulent pretenses and representations, and (ii) his reimbursement of certain sources to cover up earlier acceptance of illegal gratuities. Specifically, the indictment alleges the defendant in Count 8 mailed a $6,204 Purchase Order from Washington, D.C. to Ridgeland, Mississippi, on April 6, 1993 as payment for the lease of a 1993 Jeep Grand Cherokee; in Count 9 mailed a $68 check to Tyson from Washington, D.C., to Springdale, Arkansas, on March 18, 1994, as payment for the Dallas Cowboys—Green Bay Packers NFL Playoff game; in Count 10 mailed a $69 check to Tyson from Washing-

ton, D.C., to Little Rock, Arkansas, on June 2, 1994, as payment for his expenses at the Tyson's weekend birthday party; in Count 11 mailed a $90 check to Quaker Oats in Chicago, Illinois, on August 25, 1994 for tickets to the Chicago Bulls—Phoenix Suns NBA Playoff game and; in Count 12 mailed a $700 check to the Fernbank Museum in Atlanta, Georgia, on September 14, 1994 for tickets to the 1994 Super Bowl.

Counts 13 through 25 of the indictment charge the defendant with violating the gratuities provision, 18 U.S.C. § 201(c)(1)(B), of the Bribery Statute, 18 U.S.C. § 201, based on the defendant's receipt of things of value from certain sources. Specifically, the indictment alleges that the defendant received the following things of value: luggage on March 14, 1993 valued at $2427 (Count 13); $3200 cash to his girlfriend on May 13, 1993 (Count 14); tickets and limousine service on September 11 and 12 to the U.S. Open Tennis tournament valued at $4446 (Count 15); tickets valued at $222 on November 10, 1993 to a Washington Bullets—New York Knicks NBA game (Count 16 ); a Waterford crystal bowl on January 17, 1994 valued at $173 (Count 17); four tickets valued at $6000 on January 18, 1993 for seats at the Presidential Inaugural Dinner (Count 18); travel and lodging expenses valued at $2556 for a Russellville birthday party held between May 14–16, 1993 (Count 19); a $1200 check given to his girlfriend on January 4, 1994 (Count 20); travel and entertainment expenses valued at $2,087 for January 15–16, 1994 while attending a Dallas Cowboys—Green Bay Packers NFL Playoff game (Count 21); a January 30, 1994 Super Bowl Ticket valued at $2200 (Count 22); employment for his girlfriend from EOP Group, Inc. ("EOP") (Count 23); tickets valued at $90 on June 18, 1993 to a Chicago Bulls—Phoenix Suns NBA Championship game (Count 24) and; a 1994 Super Bowl tickets valued at $857 (Count 25).

Counts 26 through 28 of the indictment charge the defendant with violating the gratuities provision of the Meat Inspection Act, 21 U.S.C. § 622, based on the defendant's receipt of illegal gratuities. Specifically, the indictment alleges the following illegal gratuities in violation of 21 U.S.C. § 622: lodging,

entertainment, and airfare valued at $2044 for a trip to Russellville, Arkansas between May 15–16, 1993 (Count 26); expenses valued at $2087 for a weekend trip to Dallas, Texas to attend the Dallas Cowboys—Green Bay Packers NFL Playoff game on January 15–16, 1994 (Count 27) and; tickets valued at $90 on June 18, 1993 to a Chicago Bulls—Phoenix Suns NBA Championship game (Count 28).

Counts 29 through 33 of the indictment charge the defendant for violating the Travel Act, 18 U.S.C. § 1952, based on the defendant's unlawful activity under the gratuities statute, 18 U.S.C. § 201(c), when traveling in interstate commerce. Specifically, the indictment alleges in Count 29 that the defendant received lodging, entertainment, and airfare when traveling from Washington, D.C., to Russellville, Arkansas, in Count 30 Chicago Bulls—Phoenix Suns NBA Championship game tickets when traveling from Washington, D.C. to Chicago, Illinois; in Count 31 U.S. Open Tennis tickets and limousine service when traveling from Washington, D.C. to New York, New York; in Count 32 Dallas Cowboys—Green Bay Packers NFL Playoff tickets and limousine service and; in Count 33 Super Bowl tickets when traveling from Washington, D.C. to Atlanta, Georgia.

Count 34 of the indictment charges the defendant with violating 18 U.S.C. § 1001 by making false statements and representations to the United States Department of Agriculture ("USDA") Office of the Inspector General to conceal his unlawful receipt of things of values from certain sources. The defendant is alleged to have submitted to the USDA Inspector General Special Agents altered and false trip itineraries for official travel he undertook in May 1993 to January 1994 after the USDA began an investigation regarding potential violations of federal laws by the defendant.

Count 35 of the indictment charges the defendant with violating 18 U.S.C. §§ 1512(b)(2)(A) and (B); and 1512(b)(3) by tampering with witnesses who were employees of the USDA. The defendant is alleged to have engaged in misleading conduct towards these employees with the intent to withhold records from the USDA Inspector General's investigation, cause objects to be impaired for use in official proceedings, and hinder the communication of information to the Special Agents of the USDA Inspector General relating to the defendant's possible federal criminal violations.

Counts 36 through 39 of the indictment charge the defendant with violating 18 U.S.C. § 1001 by making numerous false statements and representations to certain departments, and officials of the Executive Office of the United States. Specifically, Count 36 alleges that the defendant made false statements and representations to Special Agents of the Federal Bureau of Investigation ("FBI") concerning his alleged solicitation and receipt things of value; Count 37 alleges that the defendant violated the Ethics in Government Act, 5 U.S.C.App. §§ 101 *et seq.*, by not reporting receipt of things of value totaling approximately $9,561 on his Public Disclosure Report, SF–278 for the calendar year 1993; Count 38 alleges the defendant failed to disclose receipt of things of value approximately $3,191 on Public Disclosure Report, SF–278 for the calendar year 1994; and Count 39 alleges that the defendant made false statements and representations on September 30, 1994 to the President's Chief of Staff and Counsel concerning his receipt and solicitation of thing of value from certain sources.

**Factual Background**

On December 24, 1992, the President–Elect of the United States selected the defendant to the Cabinet position of Secretary of the United States Department of Agriculture. The defendant served as the Secretary of the USDA from January 22, 1993 until December 31, 1994. Beginning on January 5, 1993 through February 16, 1995, it is alleged that the defendant sought to defraud the United States and its citizens of (i) their right to honest services and (ii) money and property.

The indictment alleges the following allegations to support charges brought against the defendant for violations of several federal laws:

Operative Facts:

**24**

On January 5, 1993 the defendant began soliciting and receiving things of value from sources regulated by the USDA during his term as Secretary of the USDA. The sources, which include Sun–Diamond Growers of California ("Sun–Diamond"),[3] Tyson,[4] Oglethorpe,[5] EOP,[6] Quaker Oats,[7] and Fernbank, Inc.,[8] gave things of value to the defendant totaling approximately $35,458.

The defendant concealed receipt of such items through the use of fraudulent means and material misrepresentations. The defendant in 1993 made false representations to the USDA to attend three separate events in his official capacity. The first was a birthday party in Russellville, Arkansas, sponsored by Tyson on May 14, 1993. The second was in Dallas, Texas, to attend a playoff football game as a guest of Tyson on January, 14, 1994. The last was in Atlanta, Georgia to attend the Super Bowl during the weekend of January 29 through 30, 1994. In June 1994, the defendant did not report these items of value received in 1993 on his Public Financial Disclosure Report, SF–278, as required by the Ethics in Government Act.

In March 1994, after the press publicly questioned to what extent the defendant received gratuities from sources regulated by the USDA an internal investigation began. On April 1, 1994, Special Agents of the USDA Office of the Inspector General interviewed the defendant regarding his acceptance of things of value from Tyson. The

defendant told them that he attended the Tyson sponsored birthday party to speak in his official capacity and not as a guest of Tyson. He also stated that he returned to Washington, D.C., in a Tyson jet because no commercial flights were available. On April 8, 1994, in response to request to produce a copy of his travel itinerary for the weekend he went to Dallas, Texas, the defendant deleted all references to his girlfriend and the limousine service provided by Tyson.

Likewise, on two separate occasions, June 1, 1994 and September 30, 1994, the defendant was questioned by other government agencies and officials. The first occurred when Special Agents of the FBI questioned the defendant about the source of certain gifts. The defendant answered that he could not recall at any time receiving things of value from entities other than Tyson. Subsequently, when questioned by the President's Chief of Staff regarding his solicitation and receipt of illegal gratuities the defendant stated in substance, "there's nothing else out there."

As questions arose to what extent the defendant accepted illegal gratuities, he began to issue and mail reimbursement checks to sources that had provided him with things of value. The payments included checks to (i) Tyson for lodging while attending a party in Russellville, Arkansas, and for a NFL Playoff ticket, (ii) the Chairman of Quaker Oats for a NBA Championship ticket, (iii) Fern-

3. Sun-Diamond is an agricultural cooperative based in California owned by five member cooperatives: Diamond Walnut Growers, Sun–Maid Growers of California, Sunsweet Growers, Inc., Valley Fig Growers, and Hazelnut Growers of Oregon. Sun–Diamond and its Senior Vice President of Corporate Affairs, Richard Douglas, are alleged to have given the defendant: luggage, cash to his girlfriend, limousine service in New York, U.S. Open Tennis tickets, NBA tickets, a Waterford crystal bowl, and contributions to the defendant's brother.

4. Tyson is a corporation with facilities in 18 states which processes, produces, and markets poultry and red meat. Tyson and its Washington, D.C. lobbyist, Jack L. Williams, are alleged to have given the defendant seats to the President's Inaugural Dinner; expenses to weekend trip to Russellville, Arkansas; a check to his girlfriend; and expenses to a weekend trip to Dallas, Texas.

5. Oglethorpe is a electrical power cooperative based in Georgia. Oglethorpe is alleged to have given the defendant a 1994 Super Bowl ticket.

6. EOP is a political and business consulting company based in Washington, D.C. EOP is alleged to have given employment to the defendant's girlfriend.

7. Quaker Oats is a corporation headquartered in Chicago which does business in grain-based cereals and snacks, and has a food division that processes red-meat products. Quaker Oats is alleged to have given the defendant tickets to a NBA Championship game.

8. Fernbank, Inc., is a private non-profit organization that runs the Fernbank Museum of Natural History in Atlanta, Georgia. Fernbank is alleged to have given the defendant tickets to the 1994 Super Bowl.

bank Museum for tickets to the 1994 Super Bowl, and (iv) the USDA for assuming lease payments on a Jeep Cherokee. In February 1995, the defendant did not report these items of value and others items received in 1994 on his Public Financial Disclosure Report, SF–278.

Additionally, the defendant used government assets and expended public funds for his personal benefit. As Secretary of the Agriculture, the defendant was entitled to a USDA leased limousine and driver for official use. Rather than having the USDA provide him with a car and driver, the defendant represented to the USDA that he would use the Jeep as his official car in Washington, D.C. In return, the USDA assumed the lease payments of the defendant's car for the period of February 1993—September 1993. The defendant did not use the Jeep as his official car in Washington, D.C., but kept it in Mississippi for his personal use until November 1993. Without an official car in Washington, D.C., from April 5, 1993 through December 31, 1994 the defendant used a USDA provided limousine and driver in Washington, D.C. On September 15, 1994, the defendant issued a check, to the USDA as reimbursement for the lease payments it assumed for the Jeep.

### Discussion

**I. Denying Defendant's Motion to Dismiss Counts 1 through 7 and Counts 9 through 12 of the Indictment for Failure to State an Offense—(Mail and Wire Fraud)**

Defendant moves pursuant to Federal Rule Criminal of Procedure 12(b)(2) to dismiss Counts 1 through 7 and Counts 9 through 12 of the indictment for failure to state an offense for wire or mail fraud. Defendant asserts that the "counts are fatally defective because the indictment fails to allege that Mr. Espy engaged in any official act whatsoever in exchange for the alleged

gratuities or otherwise failed to render honest services as Secretary of Agriculture, or that he had any specific intent to do so," under 18 U.S.C. §§ 1341, 1343, 1346.[9] As fully set forth below, after viewing all the allegations of the indictment in its entirety, there are sufficient grounds for sustaining the charges for Wire and Mail Fraud, 18 U.S.C §§ 1341, 1343, 1346. Thus, Counts 1 through 7 and 9 through 12 shall not be dismissed.

■ Counts 1 through 7 allege that the defendant violated the Wire Fraud statute, 18 U.S.C §§ 1343, 1346. Counts 9 through 12 allege the defendant violated Mail Fraud statute, 18 U.S.C. §§ 1341, 1346. The relevant language in both the Wire and Mail Fraud ("Wire Fraud") statutes is the same, and therefore, both offenses will be examined together for the purposes of this analysis. *See United States v. Sawyer*, 85 F.3d 713, 723 (1st Cir.1996) (*citing United States v. Boots*, 80 F.3d 580, 586 n. 11 (1st Cir.1996)). Section 1343 provides in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . [uses the mails or wires, or causes their use] for the purpose of executing such scheme or artifice . . . [shall be punished].

Thus, the elements of wire fraud are (1) a scheme to defraud, and (2) use of interstate wire communication to further that scheme. *United States v. Lemire*, 720 F.2d 1327, 1334–35 (D.C.Cir.1983) (citations omitted). Section 1346 defines the term "scheme or artifice" to include a scheme or artifice to deprive another of their intangible right to honest services.[10]

■ The meaning of honest services has not received even interpretation from the

---

**9.** Defendant's Motion to Dismiss ("Def.'s Mem.") Counts 1 through 7 and Counts 9 through 12 at 2.

**10.** In *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the Supreme Court held that the term "scheme and artifice to defraud" did not encompass the intangible right of the citizenry to good government. In 1988

Congress enacted 18 U.S.C § 1346 to overturn and clarify the Supreme Court's decision in *McNally*. Section 1346 was intended to reinstate pre-*McNally* case law holding that Mail and Wire Fraud statutes included an individual's intangible right to honest services of government officials. *See United States v. Sawyer*, 85 F.3d 713, 723–24 (1st Cir.1996).

courts. *See United States v. Brumley,* 116 F.3d 728, 733 (5th Cir.1997) (*citing United States v. Holzer,* 816 F.2d 304, 307–310 (7th Cir.1987)). Generally, honest services fraud contemplates instances where the defendant in rendering services was aware that his actions were less than in the best interests of the employer. *Brumley,* 116 F.3d at 734. It also encompasses instances when a public decision-maker fails to disclose a conflict of interest resulting in personal gain. *Sawyer,* 85 F.3d at 724; *see United States v. Mandel,* 591 F.2d 1347 (4th Cir.1979) (Public officials failure to disclose existence of a direct interest in a matter that he is passing on is actionable under Mail Fraud statute). Although, not every dishonest or disloyal act by an employee violates the wire fraud statute, a breach of fiduciary duty to disclose material information to an employer falls within the strictures of the statute. *United States v. Silvano,* 812 F.2d 754, 759 (1st Cir.1987); *see Sawyer,* 85 F.3d at 724 (Public officials have an affirmative duty to disclose material information to the public employer). A public official's fraud on the public may clearly fall within the meaning of honest services fraud where dishonest conduct by the public official directly implicates the functions and duties of that official's public office. *U.S. v. Rabbitt,* 583 F.2d 1014, 1024 (8th Cir.1978). Moreover, public officials may be held to a higher standard of public trust due to concerns that conflicts of interest may harm the public merely by giving the illusion of unfairness. *Lemire,* 720 F.2d at 1337 n. 11. Thus, undisclosed, biased decision making for personal gain, whether or not tangible loss to the public is shown, constitutes a deprivation of honest services. *Sawyer,* 85 F.3d at 724.

■ The defendant's first argument that the indictment should be dismissed because it failed to state that he "engaged in any official act for the alleged gratuity or otherwise failed to render honest services as Secretary of Agriculture" is misplaced.[11] The D.C. Circuit in *Lemire* concluded that to constitute a deprivation of honest services, the breach of fiduciary duty must have some element of dishonesty. *United States v. DeFries,* 129 F.3d 1293, 1305–06, (D.C.Cir. 1997). The law in this Circuit does not require allegations that a *quid pro quo* or selling of office is necessary for the indictment to support charges for honest services fraud.[12] *See id.* (A public official's breach

---

11. Def.'s Mem. Counts 1 through and 9 through 12 at 3.

12. The defendant cites *United States v. Sawyer,* 85 F.3d 713 (4th Cir.1996), *United States v. Rabbitt,* 583 F.2d 1014 (8th Cir.1978), *United States v. Czubinski,* 106 F.3d 1069, (1st Cir.1997), and *United States v. McNeive,* 536 F.2d 1245 (8th Cir.1976), for the proposition that the indictment must allege "the official failed to carry out his official duties conscientiously or otherwise took official action in a manner detrimental to the public" to charge honest services fraud. Def.'s Mem. Counts 1 through 7 and 9 through 12 at 4. Thus, according to the defendant, the mere violation of a gratuities statute is insufficient to support such a charge. *Id.* at 5–6. However, viewing these assertions in their proper factual context of their respective opinions, the court concludes the facts in these proceedings are sufficiently distinguishable. In *Sawyer,* the defendant, a lobbyist, was convicted for engaging in conduct to cause state legislators to violate their duty to the public. The First Circuit concluded that honest services fraud "cannot stand where the [public official's] conduct [did] not actually deprive the public of its right to her honest services, and it is not shown to intend that result." *Sawyer,* 85 F.3d at 725. The First Circuit reversed the mail fraud convictions on the specific grounds that the jury was

permitted to find honest services fraud upon a violation of either a civil gift statute or a criminal gratuity statute. The civil gift statute did not necessarily entail the same intent requirements required to prove honest services fraud. *Id.* at 728. The criminal gift statute, however, could sufficiently charge the jury as to the proper intent requirements in order to prove honest services fraud. *Id.* at 730. The First Circuit observed that the requisite § 1346 intent could be found from a violation of a criminal gratuity statute by proof that "a person with continuing and long-term interests before an official ... engage[d] in a pattern of repeated, intentional gratuity offenses in order to coax ongoing favorable action in derogation of the public's right to impartial services." *Id.* Thus, the court concluded that violation of a criminal gratuity statute itself could be sufficient to implicate honest services fraud.

In *Rabbitt,* the defendant was an elected state official who failed to disclose commissions on architectural contracts he received for recommending them to persons authorized to award government contracts. The Eighth Circuit reversed the defendant's mail fraud conviction because there was no evidence that the defendant's conduct deprived the public of (1) some tangible benefit, (2) their right to honest and fair dealing in performing his official duties, and (3) right to

of fiduciary duty is criminally fraudulent only accompanied by a misrepresentation or non-disclosure that is intended to deprive the person whom the duty is owed some legally significant benefit) (*citing Lemire*, 720 F.2d at 1335). In this case, the allegations that the defendant solicited and received illegal gratuities, intentionally violated a criminal gratuities statute and later committed acts to conceal this illegal activity are sufficient to support an indictable offense for honest services. *See Holzer*, 816 F.2d at 304 (Public official's systematic and long-continued receipt of bribes coupled with active efforts to conceal cognizable as honest services fraud); *see also United States v. Bush*, 522 F.2d 641 (7th Cir.1975) (Breach of fiduciary duty, failure of public official to disclose his ownership interest in corporation recommended to the city, and active concealment of the fraud cognizable as honest services fraud); *Silvano*, 812 F.2d at 754 (Concealment of material information by an employee under an affirmative duty to disclose to his employer cognizable as honest services fraud) (citations omitted); *Mandel*, 591 F.2d at 1363 ("Non-disclosure or concealment, or both, of material information may constitute actionable fraud under Mail Fraud statute"); *cf. Rabbitt*, 583 F.2d at 1014 (Reversed mail fraud conviction because no applicable standard of conduct

clearly imposed an affirmative duty on state legislator to disclose his interest in a contract). It is not disputed that the existence of an apparent conflict of interest is sufficient to constitute a violation of a government agent's fiduciary duty. *See United States v. York*, 890 F.Supp. 1117, 1126 (D.D.C.1995). It is also not contested that misrepresentation or intentional non-disclosure are inherently dishonest acts. *DeFries*, 129 F.3d 1293, 1305–06. Therefore, since the defendant's alleged breach of fiduciary duty includes elements of dishonesty, the indictment sufficiently states an offense honest services fraud.

Federal Rule of Criminal Procedure 7(c) requires that the indictment state the essential facts constituting the charged offense. The indictment sets forth the essential facts to establish a charge for deprivation of "honest services" under the Wire Fraud statute. It alleges that as a Federal Executive official, the defendant had a statutory duty to prepare and file a Public Financial Disclosure Report, SF–278 under Title I of the Ethics in Government Act. *See* Indictment at ¶ 10. Therefore, he had to truthfully disclose, among other things, gifts aggregating $250 or more in value from any one source he received during his tenure as Secretary of Agriculture. *Id.* The government contends

---

disclosure of the defendant's interest in the contracts. *Rabbitt*, 583 F.2d at 1025. However, unlike the facts in this case, the defendant in *Rabbitt* did not, in his official capacity, control the granting of contracts where a conflict of interest was implicated or had any clearly required duty to disclose his interests in the contracts. *Id.* at 1026.

In *Czubinski*, the defendant was an Internal Revenue Service ("IRS") employee whose duties mainly involved accessing confidential taxpayer files to assist those taxpayers with questions on their returns. The defendant was convicted on nine counts of Wire Fraud for unauthorized searches of taxpayer files. The First Circuit court reversed the defendant's honest services fraud conviction because (1) his actions did not call into question a discretionary, decision-making role, (2) the defendant's conduct was a workplace violation and had no reason to believe that the performance of unauthorized searches would be punishable by anything more than dismissal, and (3) there was insufficient proof that he intended to deprive the public or his employer to his honest services. *Czubinski*, 106 F.3d at 1077. Thus, the government failed to prove his conduct

amounted to a scheme to deprive the public's right to his honest services. *Id.*

In *McNeive*, the defendant was a city plumbing inspector who received unsolicited $5 gratuities for the nondiscretionary, administrative task of issuing plumbing permits. Although, the defendant violated a city ordinance prohibiting city officials from receiving gratuities, the defendant never materially misrepresented the existence of the gratuities or actively concealed this practice. The 8th Circuit court reversed the mail fraud conviction because the government did not prove there was a scheme to deprive the city of his honest services.

The facts in this case are sufficiently distinguishable from those in *Czubinski* and *McNeive*. Defendant Espy, former Secretary of Agriculture, is alleged to have solicited and received gratuities, made material nondisclosures on a statutorily required Public Financial Report, and made affirmative misrepresentations and other acts to conceal his activities. *See* Indictment ¶¶ 7, 10, 11, 13. The defendants in *Czubinski* and *McNeive* were never improperly influenced over discretionary matters that breached an affirmative duty to disclose the conflict of interest.

that the defendant's failure to comply with this disclosure requirement was not an isolated incident but part of a pattern of related events.[13] These related events include, among others, allegations that (1) the defendant illegally solicited and received gratuities from individuals and business entities with matters pending before his office, (2) submitted false public disclosure reports in 1994 and 1995 that concealed receipt of those gratuities, and (3) concealing his activities concerning receipt of the gratuities by lying to investigators and mailing reimbursements to make his acceptance seem lawful. *See* Indictment ¶¶ 7, 10, 11, 13. As such, the indictment contains the sufficient factual requirements to charge that the defendant devised a scheme to defraud citizens of their honest services from public officials.

The defendant's second argument that the indictment is required to allege that the defendant had the specific intent not to exercise disinterested judgment on official matters under an honest services offense is also unavailing. The indictment satisfies Fed.R.Crim.P. 7(c) by explicitly alleging that the "defendant did devise, and intend to devise, a scheme and artifice [] to defraud ... to obtain property." *See* Indictment at ¶ 5. This allegation sufficiently charges that the defendant had the requisite specific intent to commit honest services fraud under the wire fraud statute. *See United States v. Bohonus*, 628 F.2d 1167, 1170–74 & nn. 5, 12 (9th Cir.1980) (Ninth Circuit found indictment for Wire Fraud sufficient where language of indictment charged that the defendant, "devised and intended to devise a scheme and artifice to defraud"). As discussed above, there is no requirement that the indictment allege that the defendant engaged in an official act for gratuities. Therefore, the allegation that the defendant had the specific intent to deprive the public of his unbiased, independent judgment on official matters is not an essential element of an honest services fraud offense. On these facts the gov-

ernment has made a clear charge of fraudulent intent for Wire Fraud, and pursuant to Fed.R.Crim.P. 7(c) the defendant is properly advised of the charges with sufficient specificity.

Accordingly, since the indictment has set forth the facts to inform the defendant that he is charged with Wire and Mail Fraud, Counts 1 through 7 and 9 through 12 shall not be dismissed.[14]

## II. Denying Defendant's Motion to Dismiss Counts 9–12 of the Indictment— (Mail Fraud)

The defendant moves to dismiss Counts 9 through 12 pursuant to Federal Rule of Criminal 12(b)(2) for failure to state an offense of Mail Fraud, 18 U.S.C. § 1341. The defendant asserts that the alleged communications in the above-mentioned counts were not made for the purpose of executing the alleged scheme to defraud. Therefore, the defendant contends that since the indictment has not stated the essentials of the second prong under the mail fraud statute, the indictment should be dismissed. The court disagrees.

The court must determine the sufficiency of the indictment by examining the indictment on its face. *United States v. Critzer*, 951 F.2d 306, 307 (11th Cir.1992). An indictment is sufficient if it clearly informs the defendant of the precise offense for which he is accused so that he may prepare his defense. *United States v. Conlon*, 628 F.2d 150, 155 (D.C.Cir.1980) (*citing Russell v. United States*, 369 U.S. 749, 763–64, 82 S.Ct. 1038, 1046–47, 8 L.Ed.2d 240 (1962) and *United States v. Debrow*, 346 U.S. 374–78, 74 S.Ct. 113, 115–16, 98 L.Ed. 92 (1953)). The test for sufficiency is whether it is fair to require the accused to defend himself on the basis of the charge as stated in the indictment. *Id.* Counts 9 through 12 of the indictment allege mail fraud which requires proof of (1) a scheme to defraud and

---

13. Opposition to Def.'s Mem. Counts 1 through 7 and 9 through 12 at 14.

14. The defendant moves to dismiss Counts 9 through 12 in a separate motion on the grounds that the indictment fails to allege sufficient facts

to establish the second element under the mail fraud statute, 18 U.S.C §§ 1341, 1346. Therefore, the court will address motion separately in the following subsection.

(2) use of the mails to further that scheme. *Lemire,* 720 F.2d at 1334–35.

 The government has sufficiently identified the essential elements of the charged offense in Counts 9 through 12 of the indictment. The second required element of mail fraud is the use of the mails for the purpose of executing a scheme to defraud. Counts 9 through 12 satisfy this second element by charging that for the purpose of executing the fraudulent scheme, the defendant caused to be mailed four separate payments to entities who provided him with the alleged gratuities. *See* Indictment at ¶¶ 17–19. There is no requirement that the government explain its plans on proving the theory of its case in the indictment. *United States v. Rayful Edmond,* 924 F.2d 261, 269 (D.C.Cir.1991). The sufficiency of the evidence is a matter to left for trial. *Critzer,* 951 F.2d at 307. At trial the government will have to establish that use of the mails was at a minimum "a part of the execution of the fraud," *Kann v. United States,* 323 U.S. 88, 95, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944), or is "incident to an essential part of the scheme ." *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). Therefore, Counts 9 through 12 of the indictment provide the defendant with the requisite notice of the charges against him. Accordingly, the defendant's motion to dismiss Counts 9 through 12 of the indictment is denied.

### III, IV, V. Denying Defendant's Motions to Dismiss Counts (i) 13–25, (ii) 14, 20, and 23 and, (iii) 29–33 of the Indictment for Failure to State a Claim— (Gratuity to Public Official and Travel Act)

The defendant moves pursuant to Federal Rule Criminal of Procedure 12(b)(2) to dismiss Counts (i) 13 through 25, (ii) 14, 20, and 23 and, (iii) 29 through 33 of the indictment for failure to state an offense under 18 U.S.C. §§ 201(c)(1)(B) and 1952. For the reasons set forth below, the court denies these motions. In his motion to dismiss Counts 13 through 25, the defendant asserts that the "indictment fails to allege a nexus between the items of value allegedly received by Mr. Espy and any 'official act.' "[15] The government in opposition argues that 18 U.S.C. § 201(c)(1)(B) does not require a nexus between the gratuity and the specific official act because the statute only requires a gratuity to be given "for or because of any official act."[16]

The defendant moves to dismiss Counts 14, 20, and 23 because he did not receive things of value "personally" as explicitly required by the gratuity statute, 18 U.S.C. § 201(c)(1)(B). These counts allege the defendant violated the gratuities statute when certain persons and entities gave items of value to his girlfriend.[17] The government argues that the defendant did "personally" receive a thing of value, such as an intangible benefit, when his girlfriend received the items of value from certain sources. Alternatively, the government argues that 18 U.S.C. § 201(c)(1)(B) prohibits the defendant from receiving directly and indirectly.[18]

Finally, the defendant moves to dismiss Counts 29 through 33 because the indictment fails to allege that the defendant traveled in interstate commerce with the intent to promote any "unlawful activity" as defined by the Travel Act, 18 U.S.C § 1952. The Travel Act defines "unlawful activity" to mean, *inter alia,* "extortion, *bribery,* or arson in violation of the laws of the State in which committed or of the United States." (emphasis added). The defendant moves to dismiss the counts because the indictment only alleges that he traveled in interstate commerce to carry on "the unlawful acceptance and receipt of unlawful things of value" for gratuities violations and not bribery violations.[19] Thus, the

---

15. Def.'s Mem. Counts 13 through 25 at 1.

16. Opposition to Def.'s Mem. Counts 13 through 25 at 1.

17. Def.'s Mem. Counts 14, 20, and 23 at 1.

18. Opposition to Def.'s Mem. Counts 14, 20, 23 at 5, 6.

19. Def.'s Mem. Counts 29 through 33 at 1–2.

The indictment brought Counts 29 through 33 for alleged gratuity violations based on 18 U.S.C. § 201(c) and 21 U.S.C. § 622 ("Meat Inspection Act"). The court dismissed all counts of the indictment for Meat Inspection Act violations against the defendant. *See* Part C sect. XI of this opinion.

defendant contends that bribery for purposes of the Travel Act refers to the specific substantive crime as defined in 18 U.S.C. § 201(b) and not the plenary bribery statute, 18 U.S.C § 201, which includes the specific substantive crime for a gratuities offense in 18 U.S.C. § 201(c). The government contends that the Travel Act refers to the plenary bribery statute, 18 U.S.C. § 201, and all of its subsections, including the specific substantive gratuities offense, 18 U.S.C. § 201(c).

▮▮ In *United States v. Sun–Diamond Growers*, 941 F.Supp. 1262 (D.D.C.1996), this court held that under 18 U.S.C. § 201(c)(1)(B) an indictment did not have to allege a nexus between a thing of value and a specific official act performed or to be performed. Presently, the United States Court of Appeals for the District of Columbia Circuit is reviewing several issues on appeal in *United States v. Sun–Diamond Growers*, Cr. Action No. 97–3072 (D.C.Cir.1997) (oral arguments held on December 11, 1997), including this court's interpretation of 18 U.S.C. § 201(c)(1)(B). The D.C. Circuit's decision may affect the disposition of all three motions because it will address the essential elements to state an offense for 18 U.S.C. § 201(c)(1)(B). The D.C. Circuit's decision may also affect whether or not it would be premature for this court to resolve the meaning of "bribery" in the Travel Act. Therefore, the court concludes that it would be in the interest of justice to resolve these motions, but to permit for the resurrecting of these motions if warranted by the D.C. Circuit's resolution of related issues.

### PART B

### VI. Denying Defendant's Motion to Dismiss All Counts of the Indictment as Duplicitous

The defendant moves to dismiss the entire indictment as duplicitous arguing that it "crams so many substantive allegations and charges into each of the counts, that it is hopelessly duplicitous." [20] Specifically, the defendant seeks to dismiss the background section claiming that it charges him with

multiple substantive offenses. Second, he contends that Count 35, which charges the defendant with witness tampering, is duplicitous for incorporating all of Count 34 (which charges him with making false statement) into Count 35. Finally, the defendant alternatively moves to dismiss Count 35 for duplicity characterizing it as charging three separate offenses in this single count. Defendant's arguments are unpersuasive.

▮▮ Federal Rule of Criminal Procedure 8(a) states that two or more offenses may be charged as separate counts for each offense in the same indictment. Duplicity occurs when two or more distinct and separate offenses are joined in a single count. *United States v. Mangieri*, 694 F.2d 1270, 1281 (D.C.Cir.1982). "An indictment, [however], is not impermissibly duplicitous even though it alleges more than one offense in a single count if the offenses being charged bear such a relationship to one another that they constitute a continuing course of conduct." *United States v. Shorter*, 608 F.Supp. 871, 875 (D.D.C.1985). Accordingly, multiple acts, each of which would constitute a separate count in an indictment, may instead be charged in a single count if the conduct could be part of a continuing scheme. *Id.* at 876, *Mangieri*, 694 F.2d at 1281–82.

### a. The Background Section is not Duplicitous

▮▮ The defendant argues that the entire indictment is duplicitous because it incorporates the background section into each count of the indictment. This argument is misplaced. Introductory paragraphs are important parts of the indictment because it assists the jury's understanding of the scope of the defendant's alleged criminal conduct. *U.S. v. Watt*, 911 F.Supp. 538, 554 (D.D.C.1995). More importantly, the "[b]ackground information is particularly useful in cases involving ... false statements . : .." *Id.* In fact, this court has previously held that it would be "difficult if not impossible, for the jury to understand defendant's allegedly false statements ... without background [paragraphs]." *U.S. v. Poindexter*, 725 F.Supp.

---

**20.** Defendant's Motion to Dismiss as Duplicitous ("Duplicitous Mt .") at 1.

13, 37 (D.D.C.1989). Moreover, when an indictment involves multiple counts that "implicate a wide range of the defendant's professional· activities ... background information is undoubtedly helpful." *Watt*, 911 F.Supp. at 554.

The present indictment alleges that the defendant made false statements and tampered with witnesses as well as committing other substantive unlawful activities. The background therefore, although extensive, permits the jury to gain a better understanding of the context in which the charges arise. There is no prohibition on incorporating by reference a background section into the counts of an indictment. In fact, the background section in this indictment thoroughly describes the setting within which the charges arise, thus providing valuable context for the jury. Furthermore, a detailed background better provides a proper basis for examining the other substantive counts of the indictment, especially in instances when the defendant engaged in alleged criminal conduct spanning over a period of two years. Finally, any potential risk of duplicity can be cured with appropriate jury instructions after all the evidence has been submitted for the jury's consideration. Accordingly, the court denies defendant's motion to dismiss the background section.

**b. Count 35 is not Duplicitous by Incorporating Facts Alleged in Count 34**

Defendant specifically moves to dismiss Count 35 for duplicity arguing that it not only incorporates the background section but, in addition, also Count 34. Count 35 charges the defendant with witness tampering, in violation of 18 U.S.C. § 1512. Count 34, on the other hand, charges that the defendant communicated false statement to the office of the General Counsel of the U.S. Department of Agriculture, in violation of 18 U.S.C. § 1001. Fed.R.Crim.P. 7(c)(1) allows for an "allegation made in one count [to] be incorporated by reference in another count." This rule allows for incorporation in order to avoid repetition in lengthy, multiple-count indictments.

The indictment in this case delineates 39 counts in different pages with separate titles and sections. For instance, Count 34 describes the office of the Inspector General at the USDA; the meeting that took place involving that office and the defendant; and the documents discussed at the meeting. Indictment at ¶ 26. The indictment then alleges the specific items involved in the defendant's scheme to conceal his unlawful activities. Count 35's incorporation of Count 34 in its entirety is overly inclusive, but not impermissibly so. Given that "the strict technical requirements of pleading have been replaced by a liberality of construction permitted by the Federal Rules of Criminal Procedure," *Shorter*, 608 F.Supp. at 876, Count 35 may stand as written. "An indictment must be sufficiently specific to inform the defendant of the charges against him and to enable him to plead double jeopardy in any future prosecution for the same offense." *Id*. In this regard, Count 34 supplements Count 35 in a fashion which provides adequate notice of the charges against the defendant. Therefore, the court denies the defendant's motion to dismiss Count 35 as duplicitous for incorporating into it Count 34.

**c. Count 35 is not Impermissibly Duplicitous for Charging Multiple Offenses in One Count**

Alternatively, the defendant argues that Count 35 should be dismissed because "it purports to charge three separate witness tampering offenses," in one count. Count 35 tracks the statutory language of 18 U.S.C. § 1512 and alleges the three ways which the defendant violated the statute. An indictment may charge the different methods by which a single crime may have been committed in the conjunctive form rather than in the disjunctive. *United States v. Burton*, 871 F.2d 1566, 1573 (11th Cir.1989). 18 U.S.C. § 1512 provides several ways in which it may be violated, thus an indictment may charge the acts conjunctively in a single count as constituting the same offense. *Id*. In any event, the burden remains with the government to prove each alleged act separately at trial. In the interest of clarity and unanimity, the court will give the jury instructions and a verdict form which will pro-

vide the appropriate guidance when the case is delivered for deliberation. Accordingly, the court denies defendant's motion to dismiss Count 35 as duplicitous by charging more than one offense in one count.

## VII. Denying Defendant's Motion to Dismiss the Indictment for Defects in the Institution of the Prosecution

In response to the Attorney General's application under 28 U.S.C. § 591(d)(1)(A), the Special Division appointed an Independent Counsel on September 1, 1994, to investigate the defendant's possible violation of federal law for accepting things of value from organizations or individuals with matters under the purview of the U.S. Department of Agriculture. *In re Espy*, Special Div. No. 94–2 (D.C. Cir. Sp. Div. Sept. 9, 1994).[21] Following Donald Smaltz's appointment as IC, he requested the Attorney General give the IC jurisdiction over any related additional investigations that had been initiated by the Department of Justice and the USDA Inspector General. The Attorney General, however, denied the IC's request.

Subsequently, pursuant to § 594(e), the IC filed an Application for a Referral of a Related Matter with the Special Division. The application claimed that the IC's investigation had uncovered substantive evidence of potential criminal law violations by associates of the defendant in matters related to the original grant of jurisdiction. The Department of Justice opposed the IC's application claiming that the IC was simply looking for "a roving license to prosecute any individual whose path may have crossed that of [Secretary Espy]—and all individuals in turn connected to that individual—in hope that if criminal charges can be brought, these individuals may have some relevant information that they can be persuaded to offer."[22] However, on April 1, 1996, the Special Division granted the IC's application for referral of a related matter under § 594(e) of the

Ethics in Government act of 1978. *See In re Espy*, 80 F.3d 501 (D.C.Cir.1996). In *In re Espy*, the Special Division reasoned that the IC has provided it with matters demonstrably related to the factual circumstances that gave rise to the Attorney General's original request for appointment of an independent counsel. *Id.* at 509. The Special Division, therefore, concluded that the granting of the referral application was warranted. The Special Division also held that,

[t]he plain language of section 594(e) in no way suggests that the concurrence of the Attorney General is required before the [Special Division] can refer a related matter to an independent counsel upon the counsel's request; rather, it plainly contemplates the opposite ... [In fact] Congress's use of the disjunctive "or" in this section ... indicates it gave the independent counsel a choice between going to the Attorney General or to the court for a referral and that the Attorney General or the court could grant such a referral.

*Id.* 80 F.3d at 505.

At present, the defendant moves to dismiss the entire indictment because the Special Division acted in violation of the Ethics in Government Act, 28 U.S.C. § 591 *et seq.*, by exceeding its authority under the Constitution. Specifically, the defendant asserts that § 594(e) does not authorize the Special Division to refer additional jurisdiction to the IC over the Attorney General's objection. The defendant then argues that "[t]he Special Division's invalid grant of jurisdiction resulted in the IC conducting an illegally expanded and extended investigation, to Mr. Espy's prejudice."[23] The defendant's assertion is neither grounded in fact nor law.

The defendant's motion is denied because it fails to allege that the current indictment was the product of the alleged questionable referral. In fact, as the government correctly points out, the 39–count indictment

**21.** For a more complete description of the factual background relating to the appointment of an Independent Counsel. *See* Introduction of this Omnibus Opinion and Order.

**22.** Opposition of the United States to Application for Referral of Related Matters at 16.

**23.** Defendant's Motion to Dismiss the Indictment for Defects in the Institution of the Prosecution ("Mt. to Dismiss for Defects") at 1.

was within the IC's original jurisdiction granted by the Special Division. As discussed above, on September 9, 1994, the Special Division appointed an independent counsel pursuant to 28 U.S.C. § 593(b) to investigate

> to the maximum extent authorized by the Independent Counsel Reauthorization Act of 1994 whether [Secretary Espy] has committed a violation of any federal criminal law ... relating to any way to the acceptance of gifts by him from organizations or individuals with business pending before the Department of Agriculture.

*In re Alphonso Espy,* Div. 94–2, Order at 1–2 (D.C.Cir.Sp.Div. Sept. 9, 1994).

The Special Division further provided the IC with authority to investigate

> other allegations or evidence of violations of any federal criminal law ... by any organization or individual developed during the Independent Counsel's investigation ... and connected with or arising out of that investigation.

*Id.* at 2. The IC was also granted the jurisdiction

> to seek indictments and prosecute any organization or individuals involved in any of the matters [outlined in the order], who are reasonably believed to have committed a violation of any federal law arising out of such matters, including organizations or individuals who have engaged in an unlawful conspiracy or who have aided or abetted any federal offense.

*Id.* Finally, the IC was vested with the authority to

> ... fully investigate and prosecute the subject matter with respect to which the Attorney General requested the appointment of independent counsel ... and all matters and individuals whose acts may be related to that subject matter.

*Id.* at 3. Based on this grant of authority from the Special Division, the IC obtained a 39–count grand jury indictment charging the defendant with various criminal conduct spanning a two year period. There is no indication that the indictment arose from the Special Division's referral. The defendant baldly alleges that the indictment is tainted by the IC's *ultra vires* investigation. The defendant, however, fails to specify which count in the indictment was the product of the referral, and in what manner he is prejudiced. Accordingly, without concrete showing that the current indictment depends on the alleged questionable referral, the court concludes that there is no defect in the institution of prosecution.

■ Moreover, the defendant's motion to dismiss for defects in the institution of prosecution requests that the court review the Special Division's decision to grant the IC's referral application. The court, however, concludes that it does not have the power to sit as an appellate tribunal to review the decision of the Special Division. The court in *United States v. Blackley* dealt with this precise issue as presented before the court, namely whether the Special Division exceeded its authority when it referred related matters to the IC over the objection of the Attorney General. The *Blackley* court cogently explained,

> Congress designated the Special Division a "division of the United States Court of Appeals for the District of Columbia Circuit" 28 U.S.C. § 49. For this court to review the constitutionality of the referral jurisdiction granted *In re Espy* [80 F.3d 501 (D.C.Cir.1996)] would require it to sit in an appellate capacity over the D.C. Circuit, which it cannot and will not do ... Nor may this court substitute its own constitutional analysis of § 594(e) and conclude that the concurrence of the Attorney General is required before the Special Division can refer related matters.

986 F.Supp. 607, 616 (D.D.C. 1997) (J. Lamberth). This court is persuaded by the holding in *Blackley.* Accordingly, the court denies the defendant's motion to dismiss the indictment for defects in the institution of the prosecutor.

## VIII. Granting in part and Denying in part Defendant's Motion for a Bill of Particulars

The defendant's motion for a bill of particulars includes a considerable list of "interrogatory" type questions requesting the government to provide him with more specific

details of the charges against him. The defendant complains that the indictment is insufficient to permit him to prepare a defense. The defendant requests, *inter alia*, that the government particularly identify the official acts or action which the defendant allegedly "performed and [was to] perform[]" on behalf of individuals and entities that provided the defendants with things of value. The defendant's motion shall be denied in part and granted in part.

 Under the Federal Rules of Criminal Procedure, it is within the sound discretion of the court to determine whether a bill of particulars should be provided. Fed. R.Crim.P. 7(f); *United States v. Butler*, 822 F.2d 1191, 1193–94 (D.C.Cir.1987). The purpose of a bill of particulars is to apprise the defendant of the charges lodged against him and of the essential facts of the crime. *United States v. NYNEX Corp.*, 781 F.Supp. 19, 22 (D.D.C.1991). "If the indictment is sufficiently specific, or if the requested information is available in some other form, then a bill of particulars is not required." *Butler*, 822 F.2d at 1193. However, a motion for a bill of particulars should be granted if the request is particularized and the requested information is necessary to prevent unfair surprise at trial. *United States v. Madeoy*, 652 F.Supp. 371, 374 (D.D.C.1987) *aff'd* 912 F.2d 1486 (D.C.Cir.1990).

 Here, the government's 51–page indictment sufficiently informs the defendant of the charges against him to allow the defendant to prepare a defense against all the counts in the indictment. Specifically, the indictment contains 14 paragraphs of underlying background facts parsed into subsections. The background facts include the duration of the defendant's alleged criminal conduct; the unlawful nature of the defendant's conduct; the names of the corporations and individuals who provided improper things of value; the value of the gifts and gratuities allegedly received by the defendant; and the specific dates when the defendant purportedly received these gifts and gratuities.

Furthermore, the government also has, pursuant to Fed.R.Crim.P. 16, turned over to the defendant "150 boxes of documents, records and memoranda from dozens of sources." [24] Prior to trial, the government will also have the affirmative duty to submit to the defendant any exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and additional relevant evidence under the Jencks Act and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). It is from these materials that the government will prosecute its case in chief. As such, "[t]he government need not [additionally] reveal to the defendant[] the precise manner in which it intends to prove its case." *United States v. Coleman*, 940 F.Supp. 15, 19 (D.D.C.1996). "It is not the function of a bill of particulars to provide detailed disclosure of the government's evidence." *United States v. Whitehorn*, 710 F.Supp. 803, 821 (D.D.C.1989). Accordingly, the court concludes that the government's indictment contains sufficient factual details and the allegations contained therein to apprise the defendant of the charges against him to allow him to present an effective defense. The defendant's motion for a bill of particulars is denied.

 The motion will be granted, however, as it relates to the defendant's request for the basis of the government's allegations that the defendant solicited and received things of value "for and because of *official acts* performed and to be performed by defendant Espy" (emphasis added). Indictment at ¶ 20. This basis is necessary to avoid unfair surprise at trial and is needed for the defendant to prepare a defense to allegations that include, but are not limited to, the violation of the Wire and Mail Fraud statutes. *Madeoy*, 652 F.Supp. at 374. Accordingly, the court grants the defendant's motion for a bill of particulars to the extent that it seeks from the government the conduct, date, place and substance of each official act referred in the indictment.

## IX. Granting in part and Denying in part Defendant's Motion to Strike Surplusage

 The defendant moves to strike surplusage language from the indictment

---

24. United States' Opposition to Motion for Bill of Particulars ("Opp. to Bill of Particulars") at 1.

claiming that some of these extraneous terms or words are irrelevant and prejudicial to the allegations against the defendant. This court has held that "[m]otions to strike surplusage from an indictment are highly disfavored in this Circuit." *United States v. Watt,* 911 F.Supp. 538, 554 (D.D.C.1995), *United States v. Jordan,* 626 F.2d 928 (D.C.Cir.1980). "The standard under Rule 7(d) has been strictly construed against striking surplusage." *Id.* (quoting *United States v. Jordan,* 626 F.2d 928, 930 n. 1 (D.C.Cir.1980)). Striking surplusage should only be used in the rarest of circumstances. *United States v. Rezaq,* 908 F.Supp. 6, 8 (D.D.C.1995). According to a preeminent treatise on criminal procedure:

> [A] motion to strike surplusage should be granted only if it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial. This is rather exacting standard, and only rarely has surplusage has been stricken.

*Watt,* 911 F.Supp. at 554 (quoting 1 Charles A. Wright, Federal Practice and Procedures: Criminal § 127, at 426 (2d Ed.1982)); *see Rezaq,* 908 F.Supp. at 8. The district court has wide discretion to strike surplusage terms that are prejudicial, irrelevant, and inflammatory. *United States v. Poindexter,* 725 F.Supp. 13, 35 (D.D.C.1989).

### a. Denying Defendant's Motion to Strike Background Paragraphs

The defendant moves to strike the background paragraphs of the indictment claiming that they contain the government's narrative and interpretation, which have no relevance to the charges against the defendant. The court disagrees. In this case, the background of the indictment is essential because it provides the defendant and the jury with the factual bases surrounding the charges against the defendant. Specifically, the background provides the jury "the full scope of defendant's activities, and ... place[s] the defendant's conduct in the appropriate context." *Watt,* 911 F.Supp. at 553. Furthermore, the background is needed to properly apprise the defendant so he may prepare a defense. Accordingly, the defendant's motion to strike the introductory paragraphs is denied.

### b. Striking Terms Suggesting Uncharged Misconduct

The defendant claims that the government's use of terms such as "included, but were not limited to," "and others," "including, but not limited to," and "in substance and among other things" is prejudicial and immaterial to the charges lodged against the defendant. In support of his argument, the defendant contends that these terms suggest that he is being "accused of criminal acts in addition to those explicitly charged in the substantive counts of the indictment." The court agrees.

"To expect the jury to assume that the inclusion of language indicative of additional misconduct has no real meaning and does not charge the defendant[] with additional crime merely because it is contained in [the indictment] ... is to ascribe to a jury of laymen an ability to draw distinction that even lawyers have difficulty making." *Whitehorn,* 710 F.Supp. at 819. This court has found that "[these terms] may encourage the jury to draw inferences that the defendant [is] believed to be involved in activities not charged in the indictment." *Id.* (quoting *United States v. Hubbard,* 474 F.Supp. 64, 82 (D.D.C.1979) (internal citation omitted)). The exclusion of these terms does not alter the substance of the indictment against the defendant. Furthermore, the government, on the other hand, fails to demonstrate any meaningful purpose for the inclusion of these terms In fact, striking these terms from the indictment would crystalize the charges and would better inform the jury of the essential substance of the indictment. Fed.R.Crim.P. 7(d) provides the court with wide discretion to strike terms or language that are immaterial or irrelevant to the indictment at issue. *Poindexter,* 725 F.Supp. at 35. Accordingly, the court concludes that the terms objected to by the defendant are unnecessary to the indictment. The court grants the defendant's motion as it relates to terms suggesting uncharged misconduct.

### c. Denying Motion to Strike References to "Girlfriends" and to the Defendant's Family

The court shall deny the defendant's request to strike the terms "girlfriends" (plu-

ral) and "family members" (plural) from the indictment. The defendant claims that "the charging paragraphs of the indictment contain no charges involving Mr. Espy's family members and refer only to a single girlfriend,"[25] and it would be prejudicial to the defendant if the indictment references his family and "girlfriends" (plural). In response, the government states that it will demonstrate that the defendant's receipt of gratuities went to more than one woman and served more than one member of his family.[26]

Fed.R.Crim.P. 7(c)(1) only requires that the indictment contains "a plain, concise and definite written statement of the essential facts constituting the offense charged." There is no requirement that the government must prove its theory of the case in the indictment. *United States v. Edmond,* 924 F.2d 261, 269 (D.C.Cir.1991). In this case, the indictment sufficiently apprises the defendant of the charges lodged against him. Whether the government can present sufficient evidence to demonstrate that more than one girlfriend and more than one family member are involved is a matter for trial. *Critzer,* 951 F.2d at 307. In the absence of a showing of prejudice or irrelevancy, the issue of whether more than one "girlfriend" or "family member" is involved should be resolved by the trier of fact. Thus, the court denies this part of the defendant's motion.

### d. Denying Motion to Strike Unnecessary Totals and Annual Revenues of Entities

■ The defendant fails to persuade the court that the "aggregation of the dollar amount of the gratuities allegedly received misleads the jury as to the scope of the actual charges against Mr. Espy."[27] The defendant asserts that the indictment unnecessarily totals the monetary amounts of the gratuities that he allegedly received. However, the sums of the gratuities purportedly received by the defendant do not alter the values of the itemized gratuities. In other words, the sum is not greater than its parts.

In fact, the sums of these gratuities function to provide the jury with the proper context surrounding the defendant's alleged misconduct. These sums do not in anyway alter the scope or substance of the allegations contained in the indictment. The court, therefore, denies the defendant's motion to strike the gratuities totals.

■ With regard to whether the inclusion of the entities' annual revenues prejudices the defendant, he similarly fails to demonstrate that the presence of these entities' annual revenues in the indictment would prejudice the defendant. The indictment provides a list of names of individuals and entities from which the defendant allegedly received gifts and gratuities. Specifically, the indictment sets forth "the annual revenues of and similar facts about the [entities] that allegedly gave gratuities to [the defendant.]"[28] For example, the indictment describes Sun Diamond as a California agricultural cooperative corporation with approximate annual revenues of $648 million. Indictment at ¶ 8(a). The indictment also describes Tyson, as a poultry and meat processing corporation with approximately $5 billion in annual revenues. The defendant suggests that these revenues are irrelevant and will prejudice the jury.

However, the defendant fails to point to a specific instance in which the revenues of these entities are manifestly prejudicial. The defendant merely asserts that "[these entities' annual revenues] serve only to prejudice Mr. Espy in the eyes of the jury by implying that the receipt of a gratuity from a corporation with '$5 billion in annual revenues' is somehow more culpable that [sic] accepting a gratuity from a more modest source."[29] This contention in unavailing. In fact, the inclusion of these entities' revenues assists the jury to understand the full scope of the defendant's alleged misconduct and places the defendant's alleged receipt of gratuities in the proper context. Furthermore, the inclusion also properly informs the jury

---

25. Def's Surplusage Mt. at 5.

26. Government's Opposition at 11–12.

27. Def's Surplusage Mt. at 7.

28. Def's Surplusage Mt. at 7.

29. *Id.* at 8.

and defendant of the entities with which the government alleges that defendant had dealings. "The need for a clear and concise indictment must be balanced against the compelling interest in presenting an organized indictment that lends structure to a complicated case involving numerous charges." *Watt,* 911 F.Supp. at 556. Accordingly, the court denies the defendant's motion to strike the entities' annual revenues from the indictment.

### e. Striking References to "Prohibited Sources"

▮ Finally, the defendant argues that the "frequent references to 'prohibited sources' [is] misleading and inflammatory."[30] The court agrees. The term "prohibited sources," as used in the indictment, refers to "persons, firms and entities" from which the defendant allegedly received gifts and gratuities. Indictment at ¶ 6(b). In *United States v. Hubbard,* the court struck the term "illegally" from the indictment because it was prejudicial and irrelevant. 474 F.Supp. 64, 84 (D.D.C.1979). The *Hubbard* court reasoned that "the use of such [a] colorful word[]" was "improper where [a] less colorful and more accurate word[] would suffice." *Id.* Here, the term "prohibited sources" does not provide additional insight into the charges against the defendant, but it only serves to suggest to the jury that the defendant's alleged receipt of gratuities from these entities constitute criminal conduct before he has an opportunity to defend himself. A more neutral term should be employed to describe these entities without altering the essential substance of the indictment. Accordingly, the court shall strike the term "prohibited sources" from the indictment.

### X. Denying Defendant's Motion to Dismiss Count 35 of the Indictment for Failure to State an Offense

Count 35 of the indictment charges the defendant with Tampering with a Witness in violation of 18 U.S.C. § 1512(b)(2)(A), (B) and (b)(3). The defendant moves to dismiss Count 35 of the Indictment because it fails to allege (i) the defendant acted "knowingly",

and (ii) the material facts to support a charge under 18 U.S.C. § 1512. After viewing the indictment in its entirety the court concludes the elements of Federal Criminal Procedure 7(c)(1) are met because there are sufficient facts to enable the defendant to prepare a defense of the offense of which he is charged.

The test for sufficiency of the indictment is whether it would be fair to require the accused to defend himself on the basis of the charge as stated in the indictment. *United States v. Conlon,* 628 150, 155 (D.C.Cir.1980). The specific charge must inform the defendant to enable him to prepare a defense and to protect him from double jeopardy. *United States v. Poindexter,* 725 F.Supp. 13, 20–21 (D.D.C.1989) (citations omitted). The sufficiency of the indictment is not a question of whether it could have been more definite and certain but whether it contains the elements of the offense intended to be charged. *United States v. Debrow,* 346 U.S. 374, 376, 74 S.Ct. 113, 114, 98 L.Ed. 92 (1953) (citations omitted).

▮ Count 35 uses the statutory language of 18 U.S.C. § 1512(b)(2)(A), (B) and (b)(3) to charge the defendant for a Tampering with the Witness offense. Count 35 in sum alleges that the defendant engaged in misleading conduct toward a USDA employee with the intent to commit certain proscribed conduct. *See* Indictment ¶ 30. Section 1512 differs only in that it provides in pertinent part, "whoever *knowingly* ... engages in misleading conduct ... with the intent to" commit certain proscribed conduct. The defendant contends that the failure to include the word "knowingly" renders Count 35 insufficient to state an offense under Section 1512. The court disagrees.

Count 35 incorporates the background section of the indictment, paragraphs 1 through 14, as well as paragraphs 26 through 28. These paragraphs provide the defendant with an adequate factual basis supporting the charge against which he must defend. Specifically, paragraphs 12, 27, 28, along with the date, location, and circumstances under which the allegedly unlawful activity occurred, state that the defendant "caused" and

---

**30.** Def's Surplusage Mt. at 8.

"knowingly" committed certain acts. These acts include "caus[ing] his staff to prepare and deliver" an altered travel itinerary to the USDA Inspector General after being requested to produce a copy of it for particular dates. *See* Indictment ¶¶ 12, 28. Further, the indictment alleges that the defendant "caused and made to be delivered" altered itinerary schedules because he "knowingly" made fraudulent representations to the USDA Inspector General about receiving unlawful gratuities from certain sources. *See id.* at ¶ 28. Taken together, these facts fairly import guilty knowledge and enough factual detail to enable him to prepare a defense.

The defendant's second argument that the indictment's failure to allege certain material facts to properly support a charge under 18 U.S.C. § 1512 is unavailing. Specifically, there is no requirement that the government has to specify how the defendant's conduct was "misleading" as proscribed in the statute. As discussed above, use of the statutory language and the detailed background section provide the defendant enough information to inform him of the offense and acts which he is charged for committing. Additionally, the indictment's failure to identify certain individuals who were allegedly targets of the defendant' "misleading conduct" is not a valid ground for dismissal. Such information might be a proper subject for a Bill of Particulars and/or a discovery request. Accordingly, the court denies this motion.

### · PART C

**XI. Granting the Defendant's Motion to Dismiss Counts 26 through 28 of the Indictment for failure to State an Offense under the Meat Inspection Act**

Counts 26–28 of the indictment allege that the defendant violated the gratuities provision of the Meat Inspection Act, 21 U.S.C. § 622, by accepting "gifts and things of value totaling approximately $4,221 ... from persons, firms, and corporation engaged in commerce and subject to the Act." Indictment at ¶ 22. The defendant moves to dismiss these counts for failure to state an offense under the Meat Inspection Act, 21 U.S.C. § 622. Specifically, the defendant urges the court to

dismiss these counts on two grounds. First, the defendant argues that Section 622 of the Meat Inspection Act only applies to on-site meat inspectors and does not reach the Secretary of Agriculture. Second, if applied to the Secretary of Agriculture, the statute is unconstitutional because it violates the Separation of Powers Doctrine.

**a. § 622 Requires A Narrow Construction as Applied to the Secretary of Agriculture**

Section 622 provides, in pertinent part, that

> *any inspector, deputy inspector, chief inspector, or other officer or employee of the United States authorized to perform any of the duties prescribed by this subchapter* who shall accept any money, gift, or other thing of value from any person, firm, or corporation engaged in commerce any gift, money, or other thing of value, given with any purpose or intent whatsoever, shall be deemed guilty of a felony and shall, upon conviction, thereof, be *summarily discharged* from office ... (emphasis added).

Section 622, as it applies to meat inspectors, is clear on its face. *United States v. Seuss,* 474 F.2d 385, 389 n. 7 (1st Cir.1973). However, the statute loses its facial clarity when it is made to apply to the Secretary of Agriculture because he is a cabinet member and cannot be "summarily discharged from office" as prescribed by the statute. Under the facts of this case, the court concludes that Section 622 does not include the Secretary of Agriculture within its ambit.

In determining whether Section 622 applies to the Secretary of Agriculture, the court must first examine the language of the statute. Section 622 is essentially a criminal statute. *Seuss,* 474 F.2d 385, 389 n. 6 (1st Cir.1973). "A criminal statute ... is to be strictly construed, but it is 'not to be construed so strictly as to defeat the obvious intention of the legislature.' " *Barrett v. U.S.,* 423 U.S. 212, 218, 96 S.Ct. 498, 502, 46 L.Ed.2d 450 (1976) (quoting *American Fur Co. v. United States,* 27 U.S. 358, 367, 2 Pet. 358, 367, 7 L.Ed. 450 (1829)). This is espe-

cially true when the literal reading or " 'application of a statute will produce a result demonstrably at odds with the intentions of its drafters.' " *Saadeh v. Farouki,* 107 F.3d 52, 58 (D.C.Cir.1997) (quoting *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)). Consequently, the court " 'must search for other evidence of congressional intent to lend [the statute] its proper scope.' " *Id.* at 58 (quoting *Green v. Bock Laundry Mach. Co.,* 490 U.S. 504, 509, 109 S.Ct. 1981, 1984–85, 104 L.Ed.2d 557 (1989)). In addition, the court must construe statutes to avoid constitutional infirmities whenever possible. *Eubanks v. Wilkinson,* 937 F.2d 1118, 1122 (6th Cir.1991). Therefore, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the [c]ourt will construe the statute to avoid such problems, unless such construction is plainly contrary to the intent of Congress." *Saadeh,* 107 F.3d at 58 (quoting *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. And Construction Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 1397–98, 99 L.Ed.2d 645 (1988)). "This approach ... reflects the prudential concern that constitutional issues not be needlessly confronted," *Id.* at 575, 108 S.Ct. at 1397, "when a statute is 'readily susceptible' to a narrowing construction that would make it constitutional." *Eubanks,* 937 F.2d at 1122; *Saadeh,* 107 F.3d at 58 ("where the evidence of congressional intent supports an interpretation that avoids [constitutional] problems, the court will adopt it.")

Section 622 mandates that an officer or employee of the United States, who is authorized to inspect meat, be summarily discharged if convicted for accepting gifts or other things of value. However, a Secretary of Agriculture cannot be "summarily discharged" by a federal statute enacted by Congress. "The Constitution does not contemplate an active role for Congress in the supervision of officers charged with execution of the laws it enacts." *Bowsher v. Synar,* 478 U.S. 714, 722, 106 S.Ct. 3181, 3186, 92 L.Ed.2d 583 (1986). Once an officer has been appointed by the President and confirmed by the Senate, U.S. Const. art. II, § 2, that officer can be removed only upon impeachment by the House of Representatives and conviction by the Senate. *Bowsher,* 478 U.S. at 723, 106 S.Ct. at 3186. "A direct congressional role in the removal of officers charged with the execution of the law beyond this limited one is inconsistent with separation of powers." *Id.*

Here, the defendant was an officer of the United States within the meaning of Article II of the Constitution. *See* 7 U.S.C. § 2202 ("[t]he Department of Agriculture shall be ... under the supervision and control of a Secretary of Agriculture, who shall be appointed by the President, by and with the advice and consent of the Senate."). The defendant served as the Secretary of the Department of Agriculture until his resignation on December 31, 1994. Because the defendant was a Secretary he could not have been "summarily discharged" as provided in Section 622. Under these facts, the court must interpret Section 622 to avoid unnecessary analysis of the constitutionality issues. *Edward J. DeBartolo Corp.,* 485 U.S. at 575, 108 S.Ct. at 1397; *Eubanks,* 937 F.2d at 1122. Since Congress could not have intended to write § 622 in a fashion to offend the separation of powers doctrine, it could not have planned to include the Secretary of Agriculture as one covered by the section. Given the clear language that one who violates § 622 is subject to summary discharge, then, logically, Congress could not have contemplated the Secretary as a person who is subject to the statute's strictures and, if violated, its consequential penalties. To conclude otherwise is to invite an analysis of whether the statute, as applied to the defendant, can withstand constitutional scrutiny— a discouraged practice in federal courts. For this reason, a narrow interpretation of the statute in this case is warranted to avoid striking § 622 for violating the separation of powers doctrine. A narrow construction of Section 622 compels the court to conclude that the defendant, a former Secretary of Agriculture, was not a proscribed person for purposes of the anti-gratuities provision of the Meat Inspection Act.

**b. A Narrow Construction of § 622 Results in its Non–Applicability to the Secretary of Agriculture**

A narrow construction of § 622 begins with its own language. Section 622 prohibits

"any inspector, deputy inspector, chief inspector, or *other officer or employee of the United States authorized to perform any of the duties prescribed by this subchapter*" from accepting things of value from entities or individuals engaged in interstate agricultural commerce. 21 U.S.C. § 622.

The government advances a forceful argument that the ordinary meaning of the phrase "officer or employee of the United States" embraces the Secretary of Agriculture. The government argues that § 622 refers to individuals "authorized" to perform meat-inspection duties; it does not require the actual performance of such duties. The government further contends that the Secretary of Agriculture is authorized to perform any responsibilities that he delegates, including those of meat inspectors. The government relies on 7 C.F.R. § 2.12 (1997), which states that "[n]o delegation of authority by the Secretary ... contained in this part or elsewhere shall preclude the Secretary ... from exercising any of the authority so delegated." Based on 7 C.F.R. § 2.12, the government asserts that the Secretary is a chief meat inspector for the purposes of § 622. This argument suffers from two infirmities.

First, Congress did not intend for § 622 to cover the Secretary of Agriculture. The Meat Inspection Act was enacted as a result of Upton Sinclair's 1906 novel, *The Jungle*. *See Seuss*, 474 F.2d at 388.[31] The novel vividly described the unsanitary conditions of the meat packing industry. As a result, in 1906, Congress enacted the Meat Inspection Act granting the Secretary of Agriculture the authority to hire inspectors to inspect establishments that process raw meat and meat by-products for commerce and human consumption. *See* 21 U.S.C. § 608. The Meat Inspection Act did not define who could be a meat inspector. However, one year after its enactment, the Department of Agriculture transmitted a statement to Congress apprising it of "the number of persons employed in such inspections and [their] salary..."[32] This statement contained an exhaustive listing of the names and titles of those vested with the duties to inspect meat.[33] Noticeably absent from the statement of "the persons employed under the meat-inspection law" was the Secretary of Agriculture.

In fact, the Meat Inspection Act does not vest the Secretary of Agriculture with meat inspection duties, but rather it recognizes his authority to promulgate and implement rules and regulations executing the Act. This is demonstrated by the several provisions in the statute that specifically require the Secretary of Agriculture to "appoint" inspectors and "cause to be made" inspections of meat processing establishments. *See* 21 U.S.C. § 601 *et seq.*,[34] *Cf.* 7 C.F.R. § 2.18(a)(1)(ii)(B) (1997) (the Undersecretary for Food and Safety is to "exercise the functions of the Secretary of Agriculture contained in ... the Federal Meat Inspection Act ... and related legislation"). Accordingly, the structure and the legislative history of the Meat Inspection Act show that Congress did not intend to include the Secretary of Agriculture within the grasp of § 622.

Second, § 622 does not expressly or contextually recognize the Secretary of Agricul-

---

31. Sharlene W. Lassiter, *From Hoof to Hamburger: The Fiction of a Safe Meat Supply*, 33 Willamette L.Rev. 411, 446 (Spr.1997).

32. *See* James Wilson, Dep't of Agriculture, *Persons Employed Under the Meat–Inspection Law*, H.R. Doc. 59–759, at 1–70 (1907) (2d Sess.), *reprinted in* 53 House Documents Serial No. 5156 (1906–07).

33. *Id.*

34. "... the **Secretary** shall cause to be made by inspectors appointed for that purpose ..." Section 603; "... the **Secretary** shall cause ... a post mortem examination and inspection of the carcasses ..." Section 604; "... the **Secretary** shall cause to be made ... an examination and inspection of all meat food products prepared for commerce ..." Section 606; "the **Secretary** shall cause to be made, by experts in sanitation or by other competent inspectors, such inspection ..." Section 608; "... the **Secretary** shall cause an examination and inspection [of all meat] made during the nighttime as well as the daytime ..." Section 609; "... the **Secretary** shall cause to made careful inspection of [meat] intended or offered for export ..." Section 615; "... the **Secretary** may appoint inspectors who shall [issue] official certificates ..." Section 616; "[t]he **Secretary** shall appoint from time to time inspectors to make examination and inspection ... and shall ... make rules and regulations as are necessary for the efficient execution of the provisions of this subchapter." Section 621.

ture as covered under the Act. "Statutory construction ... is a holistic endeavor." *United Savings Assoc. of Texas v. Timbers of Inwood Forest Assoc. Ltd.*, 484 U.S. 365, 371, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988). "Just as a single word cannot be read in isolation, nor can be a single provision of a statute." *Smith v. United States*, 508 U.S. 223, 233, 113 S.Ct. 2050, 2056, 124 L.Ed.2d 138 (1993). A holistic approach requires the court to examine a particular provision within the overall structure of the statute. *See id.* Thus, " 'where Congress includes particular language in one section of a statute but omits it in another section of the same [a]ct, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' " *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983). Here, § 622 cannot be read in isolation, but must be construed in the overall context of the Meat Inspection Act. Such an approach reveals that the several sections that precede § 622 specifically refer to the Secretary and his authorities under the Meat Inspection Act.[35] This omission is further evidence of Congress's choice not to include the Secretary of Agriculture under § 622's coverage.

Furthermore, § 622 is quite specific in listing individuals proscribed under the Meat Inspection Act from accepting things of value. Section 622 contains three specific terms—"inspectors, deputy inspectors, chief inspector"—then sets forth the broad terms of "any officer or employee of the United States ..." The D.C. Circuit has explained that this statutory structure "brings to mind a longstanding canon of statutory construction, *ejusdem generis.* Under that familiar canon, where the general words follow the enumeration of particular class of things, the general words are ... construed as applying only to things of the same general class as those enumerated." *American Min. Congress v. EPA*, 824 F.2d 1177, 1189 (D.C.Cir. 1987). Here, the specific terms of "inspector, deputy inspector, and chief inspector" immediately precede the broader terms of "officer or employee of the United States." Therefore, the terms "officer or employee" must be construed to mean those who perform the duties of meat inspectors. Under this reasoning, the defendant, although a former employee of the United States, is not embraced by the provisions of § 622.

In summary, under the facts of this case, the court concludes that Congress did not intend for § 622 to extend to the Secretary of Agriculture. Thus, the court grants the defendant's motion to dismiss Counts 26–28 from the indictment for failure to allege an offense under the Meat Inspection Act.

## XII. Granting the Defendant's Motion to Dismiss Count 39 of the Indictment for Failure to State an Offense under 18 U.S.C. § 1001

Count 39 of the indictment charges the defendant with a violation of 18 U.S.C. § 1001 for making false statements regarding his alleged receipt of illegal gratuities to the President's Chief of Staff and Counsel in 1994. The government contends that the defendant's statements violated Section 1001 because they occurred "in a matter within the jurisdiction of the Executive Office of the President, within the Executive Branch, a *department* of the United States." (emphasis added). Thus, the narrow issue presented in this motion is whether Section 1001, as interpreted prior to its 1996 amendments, included the President's Chief of Staff and Counsel as an executive "department" within the meaning of this section. For the reasons stated below the court dismisses this count because the defendant's alleged false statements were not made in matters within the jurisdiction of any executive "department" of the United States.

Section 1001 criminalizes false statements if made "in any matter within the jurisdiction of any department or agency of the United States." 18 U.S.C. § 1001. In *Hubbard v. United States*, 514 U.S. 695, 115 S.Ct. 1754, 131 L.Ed.2d 779 (1995), the Supreme Court held that the term "department" applies only to departments of the executive branch. In determining that federal courts were not "departments" within the meaning of the statute, the Supreme

---

**35.** *See* Sections 603, 604, 606, 608, 609, 615, 616, and 621 of the Federal Meat Inspection Act.

Court relied heavily on the statutory definition of "department" as set forth in 18 U.S.C. § 6. Section 6 provides that unless the "context shows" otherwise, for all Title 18 offenses, "department" means one of the executive departments enumerated in 5 U.S.C. § 101.[36] *Hubbard*, 514 U.S. at 700, 115 S.Ct. at 1757–58.

Under 5 U.S.C. § 101, neither the President's Chief of Staff nor White House Counsel is listed as an executive "department." Therefore, any false statements made to them cannot be prosecuted as an 18 U.S.C. § 1001 offense. Additionally, no persuasive reason exists to deviate from the clear statutory language of Section 101 to include them as a "department." The government has not demonstrated any "powerful" or "strong" reason to suggest the "context" of this section "shows" that Congress meant to include the President's Chief of Staff and White House Counsel as an executive "department." *Id.* at 700–01, 115 S.Ct. at 1757–58. In fact, the government concedes that 18 U.S.C. § 6 limits the terms "department" to the 14 departments enumerated in 5 U.S.C. § 101. Opposition to Def.'s Mem. Count 39 at 13. Accordingly, the court dismisses Count 39 of the indictment because it lacks the requisite jurisdictional elements to support a sufficient charge under 18 U.S.C. § 1001.

**SO ORDERED.**

A separate Order for Entry of Judgment Accompanies this Omnibus Opinion and Order.

### ORDER

In accordance with the Omnibus Opinion and Order issued on the 22 day of December, 1997, it is this 22 day of December, 1997,

**ORDERED** that Defendant Michael Espy's Motion to Dismiss Counts 1 through 7 and Counts 9 through 12 of the Indictment for failure to State an Offense be and is hereby **DENIED**\*; [1]

**FURTHER ORDERED** that Defendant Michael Espy's Motion to Dismiss Counts 9 through 12 of the Indictment be and is hereby **DENIED**\*;

**ORDERED** that Defendant Michael Espy's Motion to Dismiss Counts 13 through 25 of the Indictment for failure to State an Offense be and is hereby **DENIED**\*;

**FURTHER ORDERED** that Defendant Michael Espy's Motion to Dismiss Counts 14, 20, 23 of the Indictment be and is hereby **DENIED**\*;

**ORDERED** that Defendant Michael Espy's Motion to Dismiss Counts 29–33 of the Indictment for failure to State an Offense Under the Travel Act be and is hereby **DENIED**\*;

**FURTHER ORDERED** that Defendant Michael Espy's Motion to Dismiss All Counts of the Indictment as Duplicitous be and is hereby **DENIED**;

**ORDERED** that Defendant Michael Espy's Motion to Dismiss All Counts of the Indictment for Defects in the Institution of the Prosecution be and is hereby **DENIED**;

**FURTHER ORDERED** that Defendant Michael Espy's Motion for a Bill of Particulars be and is hereby **GRANTED in part** and **DENIED in part;**

**ORDERED** that Defendant Michael Espy's Motion to Strike Surplusage be and is hereby **GRANTED in part** and **DENIED in part;**

**FURTHER ORDERED** that Defendant Michael Espy's Motion to Dismiss Count 35 of the Indictment for Failure to State an Offense be and is hereby **DENIED;**

**ORDERED** that Defendant Michael Espy's Motion to Dismiss Counts 26 through 28 of the Indictment for failure to State an Offense under the Meat Inspection Act be and is hereby **GRANTED;** and it is

---

**36.** Executive "departments" as enumerated in 5 U.S.C. § 101 are the Departments of State, Treasury, Defense, Justice, Interior, Agriculture, Commerce, Labor, Health and Human Services, Housing and Urban Development, Transportation, Energy, Education, and Veterans Affairs.

**1.** \*Defendant may re-bring these resolved motions if timely justified by the decision in *United States v. Sun–Diamond*, Cr. Action No. 97–3072 (D.C.Cir.1997), now pending before the United States Court of Appeals for the District of Columbia Circuit.

**FURTHER ORDERED** that Defendant Michael Espy's Motion to Dismiss Count 39 of the Indictment for Failure to State an Offense under 18 U.S.C. § 1001 be and is hereby **GRANTED**;

**SO ORDERED.**