**UNITED STATES of America,**

v.

**Maria HSIA, Defendant.**

**Criminal No. 98–0057(PLF).**

United States District Court,
District of Columbia.

Aug. 13, 1998.

---

· OPINION

PAUL L. FRIEDMAN, District Judge.

This case is before the Court on fourteen pre-trial motions filed by defendant Maria Hsia.[1] The Court heard argument on the motions on July 27 and 28, 1998.

The Court will issue separate opinions addressing defendant's Motion 1 (to Dismiss the Indictment for Violation of Due Process); Motion 2 (to Dismiss Counts in the Indictment for Their Positive Repugnance to the Federal Election Campaign Act); Motion 3 (to Dismiss Count 1 of the Indictment for Failure to State an Offense under 18 U.S.C. § 371); Motion 5 (to Dismiss Counts 2 through 6 for Failure to State an Offense Under 18 U.S.C. §§ 2(b) and 1001 (Causation)); Motion 6 (to Dismiss Counts 2 through 6 for Failure to State an Offense Under 18 U.S.C. §§ 2(b) and 1001 (False Statements)); Motion 7 (to Dismiss Counts 4 and 5 for Failure to State an Offense Under 18 U.S.C. §§ 2(b) and 1001 (Soft Money)); Motion 9 (to Dismiss Indictment Because It Offends the First Amendment); Motion 10 (to Dismiss Indictment Because It Selectively Prosecutes Maria Hsia); and Motion 11 (to Dismiss Indictment Because It is Tainted).

For the reasons discussed below, the Court will deny Motion 4 (to Dismiss Count 1(FEC) and Counts 2–6 for Failure to State an Offense under 18 U.S.C. §§ 371 and 1001 (Intent)) and Motion 13 (to Dismiss Count 1 for Lack of Venue). The Court will grant in part and deny in part Motion 8 (to Strike Surplusage); Motion 14 (to Compel Discovery and Disclosure of Exculpatory Information); and Motion 15 (for a Bill of Particulars).

## I. BACKGROUND

### A. Federal Election Campaign Act

The Federal Election Campaign Act ("FECA"), 2 U.S.C. §§ 431 et seq., provides a detailed set of limits governing contributions to electoral campaigns and expenditures by candidates. Of specific relevance to this case, FECA provides that "[n]o person shall

Eric L. Yaffe, U.S. Dept. of Justice, Campaign Finance Task Force, Washington, DC, for U.S.

Nancy Luque, Reed Smith Shaw & McClay, Washington, DC, for Maria Hsia.

1. Ms. Hsia filed fifteen numbered motions, but Motion No. 12 simply requested an extension of time, and the Court has already granted that motion.

make contributions" that exceed certain limits set forth in the statute. 2 U.S.C. § 441a. The statute also prohibits any person from making contributions in the name of another or knowingly permitting her name to be used to effect such a contribution, 2 U.S.C. § 441f, and prohibits corporations from making contributions in connection with "any election at which presidential or vice presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to, Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices," 2 U.S.C. § 441b(a). The statute charges the Federal Election Commission ("FEC") with the administration and enforcement of FECA. 2 U.S.C. § 437c. It provides for both civil and criminal enforcement, and specifies criminal penalties for certain violations, up to a maximum of one year imprisonment and/or a fine. 2 U.S.C. § 437g(d).

A "contribution" is defined by statute, in relevant part, as "money or anything of value made by any person for the purpose of influencing any election for *Federal* office," *see* 2 U.S.C. § 431(8)(A) (emphasis added), and the contribution limits set forth in FECA undisputably apply to contributions made to candidates for federal office, otherwise known as "hard money" contributions. In this case, the government does not dispute that FECA does not generally cover contributions for state or local campaigns and non-campaign activities such as issue advocacy, otherwise known as "soft money" contributions.[2] National political parties that support both federal and state/local candidates have set up separate accounts: "hard money" accounts for contributions that are subject to FECA and that are used for candidates in federal elections and "soft money" accounts for funds to be used only for non-federal campaigns and for non-campaign activities.

FECA requires "political committees," including national political parties, to file reports with the FEC identifying each person who made "contribution[s]" in the aggregate

annual amount of $200 or more. 2 U.S.C. § 434. FEC regulations go further, requiring national political party committees to report any receipt of funds over $200, regardless of whether the funds are deemed "hard money" or "soft money." 11 C.F.R. § 104.8(e) (requiring information, including name, address and occupation of all individuals or entities who "donate" an aggregate amount in excess of $200 in any calendar year to a national party committee's non-federal account(s)).

### B. The Indictment

Count 1 of the indictment charges that Ms. Hsia conspired with the International Buddhist Progress Society ("IBPS"), a tax-exempt religious organization doing business as the Hsi Lai Temple (the "Temple"), and other unnamed co-conspirators to defraud the United States by impairing, obstructing, impeding and defeating the lawful functions and duties of the FEC and the Immigration and Naturalization Service ("INS") in violation of 18 U.S.C. § 371.[3] The indictment alleges that Ms. Hsia solicited IBPS to make contributions through "straw" donors or "conduits" (some of whom were monks, nuns and volunteers from IBPS) and made campaign contributions in her own name knowing that the IBPS would reimburse her. The indictment alleges that Ms. Hsia (1) impaired and impeded the FEC by concealing the fact that IBPS was the true source of the contributions, and (2) impaired and impeded the INS by submitting documents to the INS stating that IBPS was not participating in political campaigns so that the INS would permit foreign nuns and monks associated with IBPS to enter or remain in the United States when she knew that IBPS in fact was making political contributions.

Counts 2–6 charge Ms. Hsia with causing the making of false statements to the FEC in violation of 18 U.S.C. §§ 2 and 1001. The indictment alleges that Ms. Hsia knowingly and willfully caused various political committees to submit material false statements to

---

2. "Contribution" is separately and more broadly defined for purposes of 2 U.S.C. § 441b. 2 U.S.C. § 441b((b)(2)). The separate definition, however, is irrelevant to this case.

3. IBPS has not been indicted for its alleged role in the conspiracy.

the FEC by concealing the identity of the true source of contributions from the committees which then relayed the false information to the FEC. Each count addresses a different report submitted to the FEC by a political committee which allegedly contained false statement(s) about the identity of actual contributors. Count 2 pertains to a July 18, 1995 report and Count 3 to an October 17, 1995 report by the Clinton–Gore '96 Committee; Count 4 relates to an April 15, 1996 report and Count 5 to a July 15, 1996 report by the Democratic National Committee; and Count 6 pertains to an October 24, 1996 report by the Patrick Kennedy Committee. Counts 2 and 3 do not identify the actual source of the contributions, but Counts 4–6 allege that IBPS was the actual contributor. Counts 2–6 all allege that Ms. Hsia solicited the contributions at issue, but only Count 6 alleges that Ms. Hsia herself wrote a contribution check for which she was reimbursed by IBPS.

## II. MOTIONS TO DISMISS

*A. Defendant's Motion 4, to Dismiss Count 1(FEC) and Counts 2–6 for Failure to State an Offense under 18 U.S.C. §§ 371 and 1001*

■ Ms. Hsia contends that Counts 2–6 (false statements) and the portion of Count 1 that is based on alleged false statements to the FEC must be dismissed because the indictment fails to allege that Ms. Hsia knew that the political committees were required to report to the FEC. This Court previously has held that "when a contributor is charged as an aider and abettor in the federal election context for causing an intermediary to make a false statement to the FEC, the prosecution must prove that 'defendant knew of the [political party] treasurers' reporting obligations, that he attempted to frustrate those obligations, and that he knew his conduct was unlawful.'" *See United States v. Trie,* 21 F.Supp.2d 7, 14 (D.D.C.1998) (*quoting United States v. Curran,* 20 F.3d 560, 569 (3d Cir.1994)). The Court in *Trie* explained that the government is required to prove this knowledge because "a showing of 'willfulness' requires" such proof in the federal election

context where the government relies on a combination of Section 2(b) and Section 1001. *United States v. Trie,* 21 F.Supp.2d at 16. The Court in *Trie* also found that the indictment sufficiently alleged the essential element of willfulness by alleging that Mr. Trie acted "knowingly and willfully" and therefore "[w]hether Mr. Trie knew of the reporting requirement of the DNC is a matter for proof at trial and the crafting of proper jury instructions." *Id.* at 20.

■ Each of the false statements counts of Ms. Hsia's indictment alleges that Ms. Hsia "knowingly and willfully caused the submission of a material false statement to the FEC." Relying on cases in which courts have created intent elements where the statutes at issue did not specify intent, Ms. Hsia maintains that the Court in *Trie* created a new element of intent and that the indictment therefore is defective because it does not specifically allege that Ms. Hsia knew of the political committees' reporting obligations. *See United States v. Keith,* 605 F.2d 462, 464 (9th Cir.1979) ("Although an indictment tracking the language of a statute is usually adequate because statutes usually include all elements of a crime, an indictment is inadequate when it fails to allege an essential element of the offense even when it tracks the language of the statute"). Ms. Hsia has read more into the *Trie* opinion than exists.

Ms. Hsia is correct that the willfulness standard articulated by the Court in *Trie* applies to Ms. Hsia as the solicitor of the alleged conduit contributors just as it applied to Mr. Trie as the alleged conduit contributor. The willfulness standard articulated in *Trie,* however, is just that: a definition of willfulness that the government must prove at trial. The Court did not create a new element or add an intent element where none had previously existed. Instead, it merely provided a definition for the existing willful intent element of a Section 1001 and 2(b) prosecution in the federal election context. As in *Trie,* the Court finds that the indictment sufficiently alleges the essential "willfulness" requirement in that it alleges that

Ms. Hsia acted "knowingly and willfully." Ms. Hsia's motion therefore will be denied.[4]

## B. Defendant's Motion 13, to Dismiss Count 1 for Lack of Venue

▮ Ms. Hsia has been charged with conspiracy to defraud the United States by impairing and impeding the lawful functions of the Federal Election Commission and the Immigration and Naturalization Service in violation of 18 U.S.C. § 371. She has moved to dismiss the conspiracy count for lack of venue. Because conspiracy is considered a continuing offense, *see United States v. Tannenbaum,* 934 F.2d 8, 12 (2d. Cir.1991); *United States v. Cordero,* 668 F.2d 32, 43 n. 17 (1st Cir.1981), venue for this charge is governed by 18 U.S.C. § 3237. In relevant part, Section 3237 provides that "any offense against the United States begun in one district ... may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). This language has been interpreted to limit venue to " 'any district in which some overt act in furtherance of the conspiracy was committed by any of the co-conspirators.'" *United States v. Lam Kwong–Wah,* 924 F.2d 298, 301 (D.C.Cir. 1991) *(quoting United States v. Rosenberg,* 888 F.2d 1406, 1415 (D.C.Cir.1989)), *cert. denied,* 506 U.S. 901, 113 S.Ct. 287 (1992); *see Hyde v. United States,* 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912).

▮ As a preliminary matter, Ms. Hsia contends that the government must allege venue separately for each of the two objects of the conspiracy—the FEC and the INS. Because the government has alleged no overt acts in the District of Columbia that were taken in furtherance of the INS object of the alleged conspiracy, Ms. Hsia argues that there is no basis for venue here for the INS as an object of the conspiracy. She cites no cases in support of this proposition. The government responds that dividing a single conspiracy charge into its two objects is inappropriate for purposes of establishing venue. It claims that it must prove at trial only that at least one act was committed in furtherance of *the conspiracy*—not one act in furtherance of *each object* of the conspiracy. It therefore follows, according to the government, that to establish venue it must allege only one overt act in furtherance of the conspiracy as a whole that occurred in the District of Columbia.[5] The Court agrees. The essence of the crime of conspiracy is the agreement. *See Braverman v. United States,* 317 U.S. 49, 53, 63 S.Ct. 99, 87 L.Ed. 23 (1942); *United States v. Young,* 503 F.2d 1072, 1076 (3rd Cir.1974). In this case, the indictment alleges that there was one agreement: to defraud the United States by impairing and impeding the FEC and the INS. Venue for Count 1 therefore is proper in the District of Columbia as long as at least one overt act in furtherance of the agreement was committed in this district.

The government maintains that the indictment alleges eight overt acts committed in the District of Columbia in furtherance of the conspiracy. Seven involve false statements that Ms. Hsia allegedly caused the campaign committees to submit to the FEC, which is located in the District of Columbia. The remaining overt act involves a March 1996 visit by Ms. Hsia and representatives of the

4. The dissenting judge in *Keith,* in a statement with which the majority did not disagree, had it right:

A distinction must be made between two different situations: (1) Where judicial or decisional gloss adds new elements to a crime; (2) Where the gloss does no more than define the meaning of an element set forth in the statute. In the former case the newly added elements must be included in an indictment. In the latter case no new element has been added. The element set forth in the statute which has been judicially defined takes on the meaning given to it by the judicial definition. In this sense the statutory language has become a term of art. When it is used in an indictment it carries with it the judicial definition.

*United States v. Keith,* 605 F.2d at 465 (Merrill, J., dissenting) (footnote omitted).

5. The three elements of conspiracy the government must prove at trial are: (1) that the defendant agreed with at least one other person to defraud the United States; (2) that the defendant knowingly participated in the conspiracy with the intent to defraud the United States; and (3) that at least one overt act was committed in furtherance of the conspiracy. *See United States v. Dean,* 55 F.3d 640, 647 (D.C.Cir.1995), *cert. denied,* 516 U.S. 1184, 116 S.Ct. 1288, 134 L.Ed.2d 232 (1996).

Temple to the White House, when they allegedly invited Vice President Gore to visit the Temple in California. *See* Indictment at ¶¶ 40(j), (m), (s), (v), (bb), (pp) & (y). Ms. Hsia contends that the seven false statements cannot be used as a basis for finding venue for the conspiracy count because neither the FEC nor the campaign committees—the only entities acting in the District with regard to the false statements—are alleged co-conspirators. She also argues that her visit to the White House was not an overt act in furtherance of the conspiracy. Ms. Hsia therefore seeks dismissal of the conspiracy count for lack of venue.

### 1. False Statements as Bases for Venue

 Ms. Hsia concedes that venue for the false statement charges (Counts 2–6) is proper in the District of Columbia because venue in false statements cases is appropriate in any district to which the false statement ultimately is forwarded, even if by a person other than the defendant. *See United States v. Bilzerian,* 926 F.2d 1285, 1301 (2d Cir.), *cert. denied,* 502 U.S. 813, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991); *United States v. Candella,* 487 F.2d 1223, 1228 (2d Cir.1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1563, 39 L.Ed.2d 872 (1974); *United States v. Crop Growers Corp.,* 954 F.Supp. 335, 353 (D.D.C. 1997). Ms. Hsia argues, however, that the seven overt acts involving false statements cannot be used as the basis for venue for the conspiracy count because venue for conspiracy is appropriate only where one of the co-conspirators actually committed an overt act. She maintains that venue for conspiracy does not lie in this district because neither Ms. Hsia nor her alleged co-conspirators *acted* in the District of Columbia to cause the committee treasurers to submit false statements.

Ms. Hsia's reading of the venue requirements for conspiracy is too narrow. Conspiracy is a continuing offense, and venue for continuing offenses is proper in any district in which the crime was begun, continued or completed. 18 U.S.C. § 3237(a). Because the submissions of the false statements to the FEC in the District of Columbia were foreseeable effects of Ms. Hsia's alleged overt acts in California, and because the submissions were necessary to the success of the alleged conspiracy to defraud the United States, venue is proper in the district in which the false statements were submitted. In *United States v. Tannenbaum,* checks were written in Manhattan but debited from an account in Brooklyn. The Second Circuit nevertheless found that venue was proper in the U.S. District Court for the Eastern District of New York in Brooklyn. "Although the checks were written in Manhattan, the actual debiting of the account—which was *not only foreseeable but, indeed, necessary to* the success of the scheme—occurred at [defendant's] bank in Brooklyn," and this was sufficient to establish venue for a conspiracy charge in that district. 934 F.2d at 12–13. While neither Ms. Hsia nor any of her co-conspirators did any act in the District of Columbia, she allegedly caused the overt act of submission of false statements to occur in the District of Columbia. The Court can see no difference between causing a check to be debited from a bank account and causing the campaign committee treasurers to submit false reports to the FEC. The overt acts involving false statements therefore are sufficient to establish venue in the District of Columbia.[6]

### 2. White House Visit as Overt Act

 The government also has alleged as an overt act that in March 1996, Ms. Hsia

---

6. While Ms. Hsia relied heavily at oral argument on *United States v. Angotti,* 105 F.3d 539 (9th Cir.1997), and *United States v. Manges,* 110 F.3d 1162 (5th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1675, 140 L.Ed.2d 813 (1998), these cases do not support Ms. Hsia's position. In *Manges,* the court found that an act by a person who was not a co-conspirator was irrelevant for purposes of *statute of limitations* analysis because consideration of that act would inaccurately imply "that the conspiracy was still a going concern." *Id.* at 1170. The statute of limitations considerations discussed by the court in

*Manges* are irrelevant to the venue analysis here. *See United States v. Tannenbaum,* 934 F.2d at 13 ("Rules governing venue and [statutes of] limitations serve distinct purposes").

In *Angotti,* the court found that there was venue for a conspiracy charge in the district where a false verification of deposit was submitted. *United States v. Angotti,* 105 F.3d at 545. The court did not imply, however, that this was the only district in which venue would lie, nor did it state that venue would not lie in the district where the false report was received.

and representatives from the Temple met with Vice President Gore at the White House. While there, they allegedly invited the Vice President to visit California and the Temple. Ms. Hsia argues that the White House visit cannot possibly be considered an overt act in furtherance of the conspiracy because it is not reasonable to infer from the allegations that the White House meeting advanced the conspiracy's goal of hiding the source of campaign contributions. While the connection between the alleged conspiracy and the White House visit appears tenuous, the Court does not agree that the visit cannot be an overt act in furtherance of the conspiracy. An overt act is "a concrete step toward carrying out the agreement, not one that actually accomplishes the goal[s] of the conspiracy." *United States v. Sarault*, 840 F.2d 1479, 1487 (9th Cir.1988). Here, the visit to the White House might be considered a "concrete step" toward carrying out the agreement and an act in furtherance of the conspiracy to conceal the Temple's political contributions.

The government maintains that the visit to the White House is an overt act in furtherance of the conspiracy because the invitation to the Vice President ultimately resulted in his attendance at the April 29, 1996 event at the Temple, for which the government alleges Ms. Hsia solicited and the Temple contributed unlawful conduit and corporate contributions. In light of this alleged connection, the Court concludes that the visit to the White House could be found to constitute an overt act in furtherance of the alleged conspiracy. Whether the White House incident was actually an act taken in furtherance of the conspiracy is a factual question for the jury to decide. The indictment adequately alleges that Ms. Hsia's visit to the White House was an overt act in furtherance of the conspiracy, and venue therefore is proper in the District of Columbia.

## III. MOTION TO STRIKE

Ms. Hsia claims in Motion 8 that a number of words and phrases in the indictment are irrelevant and prejudicial, and she therefore requests that the Court exercise its discretion under Rule 7(d) of the Federal Rules of Criminal Procedure to strike these items from the indictment as surplusage. The words and phrases at issue are: (1) references to Ms. Hsia as "a/k/a Hsia Ling" in the caption and in paragraph 1 of the indictment; (2) references in Count 1 to contributions to candidates for state and local elections; (3) references in Count 1 to contributions to the DNC which Ms. Hsia characterizes as "soft money" contributions; (4) references in Count 1 to alleged acts of concealment or "cover-ups" as part of the alleged conspiracy; (5) references in Count 1 to President Clinton and Vice President Gore; (6) certain assertedly inflammatory words and phrases in Count 1, such as "unlawful," "secret, disguised and illegal," "illegal," "straw donors," "conduit," "long-standing pattern," "covered-up," and "falsely;" and (7) the words "among others" and "and elsewhere" in paragraph 40.

 In exercising the Court's authority to strike surplusage, "[m]aterial that can fairly be described as 'surplus' may only be stricken if it is *irrelevant and prejudicial*." *United States v. Oakar*, 111 F.3d 146, 157 (D.C.Cir.1997) (emphasis added). *See also United States v. Watt*, 911 F.Supp. 538, 554 (D.D.C.1995). Since it is the practice of this Court to provide a copy of the indictment to the jury, inflammatory statements in the indictment that are not essential to allegations respecting the crimes charged may prejudice the defendant and should be stricken. *Relevant* language, however, "should not be stricken even if it may be prejudicial." *See United States v. Weinberger*, Crim. No. 92–235, 1992 WL 294877, at *7 (D.D.C. Sept.29, 1992). Upon review of the words and phrases at issue, the Court concludes that some of the challenged items are both irrelevant and prejudicial and will be stricken; some do not meet the standard for striking surplusage and will be retained; and some cannot be resolved until the Court addresses Motions 3 (to Dismiss Count 1 of the Indictment for Failure to State an Offense under 18 U.S.C. § 371) and 7 (to Dismiss Counts 4 and 5 for Failure to State an Offense Under 18 U.S.C. §§ 2(b) and 1001 (Soft Money)) and will be retained pending disposition of those motions.

■ Ms. Hsia challenges the use of the designation "a/k/a Hsia Ling" in the caption and in paragraph 1 of the indictment, the only two references to her by that name. "Hsia Ling" is the given name of Ms. Hsia, who was born in China. While "Hsia Ling" is not an alias in the traditional sense, the given name of a foreign-born defendant is somewhat analogous to an alias especially where, as here, the foreign name is preceded by "A/K/A." The use of aliases in indictments is disfavored, *see United States v. Wilkerson,* 456 F.2d 57, 59 (6th Cir.), *cert. denied,* 92 S.Ct. 2506, 2507, 408 U.S. 926, 33 L.Ed.2d 337 (1972); *United States v. Ramos,* 839 F.Supp. 781, 787 (D.Kan.1993), and aliases should only be retained when "the Government intends to introduce evidence of an alias and the use of that alias is necessary to identify the defendant in connection with the acts charged . . ." *United States v. Clark,* 541 F.2d 1016, 1018 (4th Cir.1976).

The Court agrees with Ms. Hsia that including both names in the indictment in this case is both unnecessary and prejudicial, and the references in the caption and in paragraph 1 of the indictment to "a/k/a Hsia Ling" therefore will be stricken. It is significant that there are no allegations in the 27–page indictment that refer to her by that name, suggesting that neither she nor any of her co-conspirators ever used the name Hsia Ling in connection with the acts charged in the indictment. At oral argument, however, the government stated that two of the documents it intends to introduce at trial refer to Ms. Hsia as Hsia Ling and that some government witnesses may know Ms. Hsia only as Hsia Ling. If those documents are relevant and otherwise admissible, the documents, including their references to "Hsia Ling," will be admitted. Similarly, if the witnesses who know Ms. Hsia only as Hsia Ling testify at trial, they may refer to her as Hsia Ling. The Court here holds only that the references to Hsia Ling in the caption and the introductory paragraph of the indictment are unnecessary and prejudicial.

Ms. Hsia next challenges references in Count 1 to contributions that were made to candidates for state and local elections (¶¶ 13(a), 14, 15, 29, 30, 40(f), (g), (w), (x)) and contributions to the DNC (¶¶ 16, 17, 27, 28, 31–35, 40(h)–(j), (t)–(v), (z)–(ee)) that she characterizes as "soft money." She asserts that the FEC has no authority to regulate such contributions and such contributions therefore are irrelevant to the alleged conspiracy to defraud the United States by impeding the lawful functions of the FEC. The government counters that: (1) these contributions impeded the lawful functions of the INS, because the ban on political contributions by tax-exempt organizations is not limited to "hard money" contributions; and (2) in the case of the contributions to the DNC, the government intends to prove at trial that these were actually "hard money" contributions. Government's Opposition at 86–88. Ms. Hsia's assertions that (1) her alleged actions could not have impeded the INS; and (2) as a matter of law her contributions cannot be considered hard money are inescapably intertwined with her Motions 3 (to Dismiss Count 1 of the Indictment for Failure to State an Offense under 18 U.S.C. § 371) and 7 (to Dismiss Counts 4 and 5 for Failure to State an Offense Under 18 U.S.C. §§ 2(b) and 1001 (Soft Money)), on which the Court has not yet ruled.[7] Until the Court rules on those motions, striking these references as irrelevant would be premature. If Ms. Hsia prevails on Motions 3 and/or 7, the Court will reconsider the request to strike these references.

■ The Court is concerned about references in the indictment to acts of concealment, cover-ups and the destruction and alteration of documents in November 1996, *see* Indictment at ¶¶ 13(e), 40(qq)–(ss), in part because the allegations provide little detail about the acts, and because references to the alleged acts of concealment and cover-up suggest the inclusion of offenses that are not part of the conspiracy charged in the indictment, which otherwise seems to encompass a conspiracy ending on or about October 24, 1996. *See United States v. Weinberger,* 1992

---

7. Motion 7 concerns Counts 4 and 5, while the references that Ms. Hsia challenges here are part of Count 1, but the contributions to the DNC alleged in Counts 4 and 5 are a subset of those alleged in Count 1. *See* Indictment at ¶¶ 27, 28, 31–33, 40(t)–40(v), 40(z)–40(bb), 47–52.

WL 294877, at *7 ("Language that serves no purpose and encourages a jury to draw inferences that a defendant was involved in collateral activities irrelevant to the indictment may be stricken"); *United States v. Hubbard*, 474 F.Supp. 64, 83 (D.D.C.1979) (striking references to other offenses).

█ If the alleged conspiratorial agreement included an agreement to engage in acts of concealment and cover-up such as those described in the indictment, those acts could be overt acts in furtherance of the conspiracy or a part of the manner and means of the conspiracy, and reference to them should not be stricken. If the alleged acts of concealment and cover-up were taken after the original conspiracy was completed or in furtherance of a subsequent and separate conspiratorial agreement, however, the acts are neither overt acts in furtherance of the alleged conspiracy charged in the indictment nor the manner and means of committing the alleged conspiracy. The fact that concealment is not inconsistent with the alleged conspiracy is not enough to establish that it was within the scope of the original agreement. "Acts of covering up ... cannot *themselves* constitute proof that concealment of the crime after its commission was part of the initial agreement among the conspirators." *See Grunewald v. United States*, 353 U.S. 391, 402, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957) (emphasis added).[8]

On the basis of the allegations in the indictment that the acts of concealment, cover-up and destruction of documents were in furtherance of the scheme to defraud that has been alleged, the Court will deny Ms. Hsia's request to strike these references. If the bill of particulars ordered by the Court

confirms Ms. Hsia's assertion that such acts of concealment and cover-up were not encompassed within the alleged scope of the original conspiratorial agreement, however, her motion to strike will be granted.[9] Otherwise, Ms. Hsia would be entitled to a jury instruction that if the government fails to prove that an agreement to conceal was part of the conspiracy to defraud the United States or otherwise to clearly establish the relevance of the alleged acts of concealment, evidence as to those alleged acts is irrelevant and should be disregarded.

█ The indictment includes several references to President Clinton and Vice President Gore, primarily in connection with their attendance at various fund-raising events, Indictment at ¶¶ 16, 27, 31, 34, 40(y) & (z), and Ms. Hsia contends that these statements are irrelevant and prejudicial. These references, however, plausibly provide context for the conspiracy charge with respect to Ms. Hsia's motive in soliciting the donations and might also be relevant to the issue of whether the donations were intended to influence a Federal election and therefore constitute "hard money." The government is not precluded from including information in the indictment used "to place the defendant's actions in context and to establish the defendant's state of mind, intent and motives." *United States v. Weinberger*, 1992 WL 294877, at *7. In context, the references to the President and the Vice President are potentially relevant and do not appear to be prejudicial. The references therefore will not be stricken.

█ Ms. Hsia also challenges the use of several potentially inflammatory words such as "unlawful," "secret, disguised and illegal," "illegal," "straw donors," "conduit,"

---

8. The government asserts that post-conspiracy acts of concealment, even if not encompassed within the scope of the charged conspiracy, are relevant to proving the existence of that conspiracy. *See Anderson v. United States*, 417 U.S. 211, 218–21, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974); *United States v. Lutwak*, 344 U.S. 604, 617, 73 S.Ct. 481, 97 L.Ed. 593 (1953); *United States v. Green*, 594 F.2d 1227, 1229 n. 1 (9th Cir.1979). While post-conspiracy acts of concealment may be admissible at trial, the analysis for admissibility at trial is distinct from the issue of whether post-conspiratorial acts can be alleged in the indictment either as overt acts in furtherance of

the conspiracy or as the manner and means of the conspiracy. *See United States v. Green*, 594 F.2d at 1229 (court admits *evidence* of post-conspiratorial acts but notes that "including the agreement to conceal as part of the original conspiracy was improper" and probably should have been stricken if defense had timely objected).

9. See further discussion *infra* at 32–33 concerning bill of particulars as to scope of the original conspiratorial agreement and details of the alleged concealment and cover-up.

"long-standing pattern," "covered-up," and "falsely." *See* Indictment at ¶¶ 11, 12, 13(a), (b), (c) & (e), 15, 17, 19, 26, 28, 30, 33, 35, 40(rr) & (ss), 42. It is inappropriate to use potentially inflammatory language in an indictment when not absolutely necessary. *See United States v. Espy*, 989 F.Supp. 17, 37 (D.D.C.1997) ("A more neutral term should be employed . . . without altering the essential substance"), *aff'd in part, rev'd on other grounds*, 145 F.3d 1369, 1998 WL 312146 (D.C.Cir. June 16, 1998); *United States v. Hubbard*, 474 F.Supp. at 83 ("colorful words . . . improper where less colorful and more accurate words would suffice"). On the other hand, *relevant* language generally "should not be stricken even if it may be prejudicial." *See United States v. Weinberger*, 1992 WL 294877, at *7.

■ Reading the challenged words in context, the Court finds that most are directly relevant to the offenses charged and are not overly prejudicial. Ms. Hsia's challenge to these words seems to rely heavily on the fact that they denote illegal activity which has not yet been proven. *See* Defendant's Reply No. 3 at 6. Whether the conduct at issue is illegal, of course, is a decision for the jury at trial. It would be very odd to limit indictments to descriptions of legal acts or to illegal acts which have already been proven, especially since "[t]here is no requirement that the *government must prove its theory of* the case in the indictment." *See United States v. Espy*, 989 F.Supp. at 36.

■ In some instances, however, the challenged phrases are unnecessarily inflammatory and their omission would not essentially alter the substance of the indictment. The phrase "secret, disguised and illegal," *see* Indictment at ¶ 13(a), adds no more information than a simple assertion of "illegal" and the assertions of conduit contributions in subsequent paragraphs. The phrase "long-standing pattern," *see* Indictment at ¶ 13(c),

is a characterization which the Court finds unnecessary in light of the fact that the indictment later alleges specific dates and the fact that paragraph 13(c) sufficiently alleges the "us[e of] conduits to disguise illegal corporate contributions" without reference to a "long-standing pattern." Accordingly, the Court will strike the words "secret, disguised and" in paragraph 13(a) and "engaging in a long-standing pattern of" in paragraph 13(c). The other words and phrases connoting illegal activity that Ms. Hsia challenges are relevant to the allegations and will not be stricken.[10]

■ Finally, Ms. Hsia challenges the use of the phrases "among others" and "and elsewhere" from the introductory statement in the paragraph listing overt acts in furtherance of the conspiracy. *See* Indictment at ¶ 40 ("the following overt acts, among others, were committed in the District of Columbia and elsewhere"). Ms. Hsia argues that these phrases accuse her "of criminal acts in addition to those explicitly charged in the substantive counts." *See United States v. Espy*, 989 F.Supp. at 35. The Court disagrees. These phrases do not accuse Ms. Hsia of additional criminal acts; at most, they suggest that there were additional overt acts some of which, in and of themselves, may have been innocent. *See United States v. Alvarez*, 610 F.2d 1250, 1255 n. 5 (5th Cir. 1980), *cert. denied*, 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 324 (1981); *United States v. Masiello*, 491 F.Supp. 1154, 1164 (D.S.C. 1980). The government need not identify all overt acts in furtherance of a conspiracy in the indictment, and these phrases ensure that the government can, if necessary, prove additional overt acts at trial. *United States v. Trie*, 21 F.Supp.2d at 22. In addition, since it is sufficient if at least one overt act has been committed in the District of Columbia and only eight in fact were committed here, *see supra* at 22–23, there is no conceiv-

10. Ms. Hsia also has challenged the use of the term "cover-up" in tandem with the word "conceal." The Court concludes that the use of the term "cover-up" is not unduly inflammatory provided that the allegations of cover-up and concealment are a part of the alleged conspiracy. As long as the bill of particulars provided by the government indicates that the alleged acts of concealment were within the scope of the conspiracy charged in the indictment, *see infra* at 32–33, the Court will not strike the term "cover-up." If the bill of particulars indicates that the alleged acts of concealment were not within the scope of the charged conspiracy, all references to cover-up and concealment will be stricken. *See supra* at 26.

able prejudice in indicating that others may have occurred elsewhere. Accordingly, these phrases will not be stricken.

## IV. DISCOVERY, *BRADY* AND BILL OF PARTICULARS

### A. *Defendant's Motion 14, to Compel Discovery and Disclosure of Exculpatory Information*

Early in the case, the government provided Ms. Hsia and her counsel with "open file" discovery. The government provided them with access to over 600,000 documents that it had collected in the course of its investigation. Ms. Hsia's initial motion complained that it was literally impossible for her counsel to cull through the 600,000 documents and identify the potentially relevant documents from this mass of paper. Since the filing of Ms. Hsia's motion, the government has provided her with three notebooks of information that it claims contain the relevant documents. While Ms. Hsia asserts that she has lost valuable trial preparation time as a result of the government's refusal to provide her with a list of the relevant documents earlier, she has narrowed her request (1) to compel discovery of her own statements pursuant to Rule 16 of the Federal Rules of Criminal Procedure, (2) to establish a schedule for production of material pursuant to the Jencks Act, 18 U.S.C. § 3500, and (3) to compel disclosure of information pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

### 1. Rule 16

Rule 16(a)(1)(A) of the Federal Rules of Criminal Procedure provides, in relevant part, that "[u]pon request of a defendant the government must disclose to the defendant and make available for inspection, copying, or photographing: any relevant written or recorded statements made by the defendant, or copies thereof, within the possession or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government …" Ms. Hsia claims that the government has failed to produce a list identifying her statements or

documents designated as her statements. Defendant's Reply No. 5 at 4. The government contends that it has provided defense counsel with copies of all of Ms. Hsia's statements and that Ms. Hsia is not entitled to a detailed index of those statements. Government's Opposition at 106. While the government is not obligated to provide Ms. Hsia with an index of her statements, it is not sufficient for the government to claim that she has had access to all statements through the government's open-file discovery. To the extent that the government has statements of Ms. Hsia's that it has not yet provided to her other than through its open-file discovery, it is required to disclose those statements to her pursuant to Rule 16.

### 2. Jencks Material

The government has agreed to provide material pursuant to the Jencks Act, 18 U.S.C. § 3500, "48 hours prior to direct testimony by each respective government witness." Government's Opposition at 117. While counsel for Ms. Hsia concedes that this ordinarily would be a reasonable proposal, she contends that releasing Jencks material only 48 hours prior to a witness' direct testimony in this case likely will lead to significant delays in trial. Ms. Hsia points out that many of the government's witnesses do not speak English, and to the extent that their statements are in Chinese, Ms. Hsia's counsel will have to translate those statements into English before she can determine whether and how she can use any of the material in cross-examination. Furthermore, at the hearing, Ms. Hsia's counsel stated that while Ms. Hsia speaks English quite well, she understands documents better if they are translated into Chinese, and it would be helpful if she could have at least some of the Jencks material translated for Ms. Hsia. The government argues that since this is a conspiracy case and Ms. Hsia has had close relationships with some of the government witnesses, the government is reluctant to release Jencks material for all witnesses more than 48 hours in advance of direct testimony.

The Court is concerned that translation issues could lead to trial delays. The Court

therefore has directed the parties to seek agreement on a schedule for release of Jencks material (including, of course, reverse Jencks material pursuant to Rule 26.2, Fed. R.Crim.P.) in order to accommodate the translation concerns of Ms. Hsia and the concerns of the government. In setting the schedule, it appears that it would be reasonable for the government: (1) to release Jencks material for many of the English-speaking witnesses more than 48 hours in advance of their direct testimony, so that Ms. Hsia's counsel can have the material translated for Ms. Hsia if necessary; (2) to release Jencks material for non-English speaking witnesses whose statements are in Chinese even earlier, so that there is sufficient time for Ms. Hsia's counsel to have the material translated into English and to prepare for cross-examination; and (3) to release Jencks material for those witnesses about whom the government has specific concerns 48 hours in advance of their direct testimony. If the parties cannot agree on a reasonable schedule pursuant to this guidance within two weeks, the Court will enter, as part of the trial management order it intends to issue in this complex case, an order setting a disclosure schedule.

### 3. *Brady*

Ms. Hsia complains that the government has not been forthcoming in its production of material pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). She claims that she has received literally no *Brady* material from the government and maintains that it is virtually impossible that there would be no *Brady* material in a case involving an in-depth investigation of this magnitude with presumably extensive grand jury testimony, FBI interviews, and testimony and interviews on Capitol Hill. While the government has represented that it "understands its *Brady* obligations and it fully intends to abide by them," Government's Opposition at 111, the Court shares defense counsel's skepticism.

■ Under the standard articulated in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the government must disclose any evidence in its possession that is favorable to the accused and material

either to a defendant's guilt or punishment. As an initial matter, it is important to set out several basic propositions of *Brady* jurisprudence. First, "favorable evidence" for purposes of *Brady,* encompasses both evidence that is exculpatory and evidence that could be used to impeach a government witness. *United States v. Bagley,* 473 U.S. 667, 676–77, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

■ Second, the existence of a duty to disclose witness statements at trial pursuant to the Jencks Act, 18 U.S.C. § 3500, does not eviscerate the government's *Brady* obligation to disclose witness statements well in advance of trial if portions of those statements also fall under *Brady.* See *United States v. Tarantino,* 846 F.2d 1384, 1414 n. 11 (D.C.Cir.), *cert. denied,* 488 U.S. 867, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988). This is important because the government is required to disclose *Brady* material in sufficient time for the defendant to "use the favorable material effectively in the preparation and presentation of its case," *United States v. Pollack,* 534 F.2d 964, 973 (D.C.Cir.), *cert. denied,* 429 U.S. 924, 97 S.Ct. 324, 50 L.Ed.2d 292 (1976), while Jencks material is not required to be disclosed until after the witness has testified.

■ Third, the fact that a person may have testified in the public realm, either before Congress or in another public arena, does not relieve the government of its *Brady* obligation if that person has made statements to the government that are both favorable and material to Ms. Hsia's guilt or punishment; it is unacceptable for the government to take the position that a person's statement does not constitute *Brady* material simply because the person made a similar statement in a public forum.

■ Fourth, open-file discovery does not relieve the government of its *Brady* obligations. The government cannot meet its *Brady* obligations by providing Ms. Hsia with access to 600,000 documents and then claiming that she should have been able to find the exculpatory information in the haystack. To the extent that the government knows of any documents or statements that

constitute *Brady* material, it must identify that material to Ms. Hsia.

██ Finally, it is important to note that courts in this jurisdiction look with disfavor on narrow readings of the government's *Brady* obligations; it simply is insufficient for the government to offer "niggling excuses" for its failure to provide potentially exculpatory evidence to the defendant, and it does so at its peril. *See United States v. Paxson*, 861 F.2d 730, 737 (D.C.Cir.1988).

██ At the same time, however, the government is not required to "deliver [its] entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *United States v. Bagley*, 473 U.S. at 675. Moreover, it is the government's responsibility in the first instance to determine whether information in its possession is *Brady* material.

██ Beyond these general warnings, it is not the court's role to "referee ... disagreements about materiality and supervise the exchange of information," *United States v. McVeigh*, 954 F.Supp. 1441, 1451 (D.Colo.1997), and the Court has little choice at this juncture but to accept the government's representation that it will immediately disclose any and all *Brady* material that it has, or discovers that it has, in its possession. The government must bear in mind, however, that it has the "affirmative duty to resolve doubtful questions in favor of disclosure," and that "if the sword of Damocles is hanging over the head of one of the two parties, it is hanging over the head of the [government]." *United States v. Blackley*, 986 F.Supp. 600, 607(D.D.C.1997) (internal quotations omitted). More fundamentally, the government would do well to remember that "the prosecutor's role transcends that of an adversary: he [or she] 'is the representative not of an ordinary party to a controversy, but of a sovereignty.... whose interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" *United States v. Bagley*, 473 U.S. at 675 n. 6, 105 S.Ct. 3375 (quoting *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)).

### B. Defendant's Motion 15, for a Bill of Particulars

Ms. Hsia requests a bill of particulars as to: (1) the identities of all other co-conspirators and the overt acts in which they participated; (2) the identification of the individuals through whom IBPS acted for all knowledge, actions or conduct attributed to IBPS; (3) the overt acts in furtherance of the alleged conspiracy not already listed in the indictment which the government intends to prove at trial; (4) the time, place, date and participants for each overt act in furtherance of the conspiracy which the government intends to prove at trial; (5) each lawful function and duty of the FEC or the INS impaired by the conspiracy, as well as how and by which overt acts it was impaired; (6) documents and entries that were destroyed or altered as part of the alleged cover-up, each individual who acted in the cover-up and the date on which the cover-up took place; (7) the IBPS personnel that Ms. Hsia contacted to solicit contributions and the manner and means of the contact; (8) all individuals who allegedly solicited contributions or were solicited for contributions, and the manner and means of the solicitations; and (9) the particular false statements alleged under Counts 2–6, what about them is false, and how Ms. Hsia caused the false statements to be made. The Court finds that Ms. Hsia is entitled to a bill of particulars as to only some of the items she has requested.

██ "Under [Rule 7(f) of] the Federal Rules of Criminal Procedure, it is within the sound discretion of the court to determine whether a bill of particulars should be provided," and the Court should grant such motions as necessary to allow the defendant to adequately prepare for and to avoid surprise at trial. *United States v. Espy*, 989 F.Supp. at 34. A bill of particulars properly includes clarification of the indictment, not the government's proof of its case. *United States v. Smith*, 341 F.Supp. 687, 690 (N.D.Ga.1972). In this case, the Court concludes that the indictment is well drafted and easy to follow. In addition, the government has provided Ms. Hsia with a set of the exhibits it intends to present in its case-in-chief at trial which,

as described by both parties at oral argument, provides Ms. Hsia with substantially all the information required to prevent unfair surprise at trial.[11]

■] Ms. Hsia's motion for a bill of particulars is overly broad and many of her requests are without merit and therefore will not be ordered by the Court. In particular, the government need not provide details, including time, place and date, of all overt acts in furtherance of the alleged conspiracy which the government intends to prove at trial. *United States v. Trie*, 21 F.Supp.2d at 22. There are, however, a few items requested without which Ms. Hsia will be unable to effectively prepare her defense and may be surprised at trial, and the Court therefore will grant her motion with respect to those items.

■] The parties agree that the names of all alleged co-conspirators have now been provided to Ms. Hsia. Given the large number of acts attributed to co-conspirators in the indictment, however, Ms. Hsia's preparation for trial will be unnecessarily complicated without knowing which acts were performed by which co-conspirators. *See United States v. Trie*, 21 F.Supp.2d at 21. Accordingly, the Court concludes that Ms. Hsia is entitled to a bill of particulars identifying, for each relevant paragraph of the indictment, which co-conspirator performed the specified acts.

■ The indictment in several places identifies specific acts performed by the alleged co-conspirator IBPS. *See* Indictment at ¶¶ 15–40(ss). Often it is not readily apparent from an indictment who performed acts attributed to corporations, and a bill of particulars is an appropriate way to identify these individuals to help the defendant prepare for trial even when the defendant is the corporation itself. *See United States v. Macleod Bureau*, 6 F.R.D. 590, 593 (D.Mass.1947) (ordering bill of particulars as to persons through whom corporate defendant became party to conspiracy in prosecution under Sherman Antitrust Act); *United States v. Glen Alden Coal Co.*, 4 F.R.D. 211, 213 (S.D.N.Y.1943) (same); *but see United States v. Ford Motor Co.*, 24 F.R.D. 65, 67–68 (D.D.C.1959) (denying such a bill of particulars because requested information was within the scope of the corporate defendant's knowledge). In this case, where the defendant is not the corporation at issue but a third party, the defendant's need for information as to individuals who acted for the corporation is even more compelling. The Court concludes that the failure to provide anything more specific than "IBPS" as the co-conspirator responsible for the alleged acts would unnecessarily burden Ms. Hsia's pre-trial preparation. Accordingly, the Court will grant a bill of particulars as to the names of the individuals who performed each act by IBPS alleged in paragraphs 15–40(ss), and the names of the individuals who acted on behalf of IBPS to form the alleged conspiratorial agreement with Ms. Hsia.

■ Ms. Hsia also requests information as to the lawful functions or duties of the FEC and the INS that were impeded by the alleged scheme, as well as how and by which overt acts those functions or duties were impeded. The Court finds this request much too broad and, with respect to the FEC, unnecessary for trial preparation. In context, the connection between the functions of the FEC, *see* Indictment at ¶¶ 5–6, and the alleged scheme to prevent the FEC from learning that IBPS had allegedly made unlawful political contributions, *see* Indictment

---

11. At oral argument, the Court requested that the government provide the Court with copies of the trial notebooks that it had prepared for Ms. Hsia in order to assist the Court in determining what information is necessary in a bill of particulars. The government agreed and Ms. Hsia indicated at that time that she did not oppose such a request. After the government had delivered the notebooks, however, Ms. Hsia filed a Motion for Reconsideration in which she indicated that she was concerned that consideration of the information in the notebooks might color the Court's assessment of Ms. Hsia's substantive motions, and she requested that the Court not look at the notebooks. Upon further review of the bill of particulars motion, the opposition and reply, it does not appear that the notebooks would materially assist the Court in its decision with respect to the bill of particulars motion. The Court therefore has not looked at the notebooks and will return them to the government.

at 11, is not so vague or ambiguous as to create a significant risk of surprise at trial.

■ The second object of the conspiracy is another matter. The indictment specifies general INS functions, *see* Indictment at ¶¶ 7–8, the manner and means of the conspiracy to impair the INS, *see* Indictment at ¶ 13(d), and overt acts which could have impeded those functions. *See* Indictment at ¶¶ 40(c)–(e). The connection between the functions of the INS and how those functions were impeded by Ms. Hsia and her alleged co-conspirators, however, is not clearly specified. The fact that a plausible connection may be inferred by a reader of the indictment does not provide sufficient protection against surprise at trial as to what connection the government will actually attempt to prove. Because the indictment is far from crystal-clear, the Court at oral argument asked government counsel about the connection between Ms. Hsia's activities and the lawful functions of the INS. The response of the government was not illuminating:

Ms. Hsia was an immigration consultant who did immigration work for the Temple, and one important part of that was the ability to bring in religious workers for 501c3 religious organizations upon presentation of documentation establishing that the religious organization met those criteria. And the Government alleges that it was an important part of this conspiracy to conceal from the INS the political activities that the Temple was engaged in because if information concerning that did come to the attention of the INS, that would have raised a question as to whether or not the Temple status under 5016 should be examined ... I don't think the indictment specifically goes into [that] reasoning or the analysis ... but the Government submits that that would be its argument as to the purpose of that.

Transcript at 193–94. The Court therefore concludes that Ms. Hsia is entitled to a bill of particulars explaining with specificity which lawful functions of the INS were allegedly impeded and how they were impeded.

■ Ms. Hsia asserts that she has insufficient information about the false statements alleged in Counts 2–6. By contrast to the indictment in *Trie*, the indictment in this case presents extremely detailed information that would appear to be sufficient to identify exactly which statements are the subject of the indictment. At oral argument the government clarified that the false statements are the reports filed with the FEC, rather than the checks by which contributions were made, and that the names reported for those contributions are what is allegedly false. Ms. Hsia now concedes that the government has shown her all the statements at issue. On the other hand, the government still has not provided a coherent explanation of how Ms. Hsia "caused" those false statements to be made. Accordingly, the Court will order a bill of particulars disclosing how Ms. Hsia is alleged to have caused each of the false statements to be made.

■ Ms. Hsia also requests detailed information as to the acts of concealment alleged in paragraphs 13(e) and 40(qq)(ss). She asserts that the government has produced copies of allegedly altered checks but nothing pertaining to the allegations in paragraphs 40(qq) and (ss) of the indictment, which allege conspiracy, cover-up and destruction and alteration of documents in November 1996, when the conspiracy appears from the indictment otherwise to have concluded on or about October 24, 1996. She contends that the alleged acts of concealment and cover-up occurred after the principal objects of the conspiracy were accomplished and that they therefore are not a part of the underlying conspiracy. She further asserts that the government has not specified by whom and when the acts of concealment were performed or the connection between the acts of concealment and the conspiracy alleged. *See* Defendant's Reply No. 5 at 10.

As is often the case when a conspiracy is charged, "the scope of the conspiratorial agreement" is the key to determining whether "an overt act may properly be regarded as in furtherance of the conspiracy." *Grunewald v. United States*, 353 U.S. at 402, 77 S.Ct. 963. There is a crucial distinction between "acts of concealment done in furtherance of the main criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been at-

tained, for the purpose only of covering up after the crime." *Id.* at 405, 77 S.Ct. 963. As Justice Kennedy has explained, "[i]f the principal objects of a conspiracy have been accomplished before an act of concealment ... then in all but the unusual case the conspiracy has ended before the cover-up begins, and one who conceals the completed crime is not by that act guilty of conspiracy to commit the substantive offense." *United States v. Green,* 594 F.2d at 1229. The Court agrees with Ms. Hsia that without more information the connection between the acts of concealment alleged in paragraphs 13(e) and 40(qq)–(ss) and the alleged conspiracy is tenuous and may be non-existent. It therefore will order a bill of particulars as to the scope of the alleged conspiratorial agreement and in particular whether and how the acts of concealment alleged in the indictment were within the scope of the conspiracy charged.

| Beyond the infirmity just discussed, the indictment does not provide Ms. Hsia with sufficient information about the specific acts of concealment alleged for her to adequately prepare her defense and avoid surprise at trial. The indictment alleges that the acts of concealment were performed by IBPS, and the Court has found that Ms. Hsia is entitled to a bill of particulars specifying the names of the individuals who performed each alleged act in the indictment that is attributed to IBPS. *See supra* at 31. In addition, because the government has not provided details concerning the documents allegedly destroyed and alleged alterations in IBPS' general ledgers, *see* Indictment at ¶¶ 40(qq) & (ss), the Court finds that in order to prepare her defense, Ms. Hsia is entitled to sufficiently specific information concerning the documents allegedly destroyed and alleged alterations in IBPS' general ledgers to adequately identify those acts of concealment and their relationship to the alleged conspiracy.

Finally, for the reasons stated in *United States v. Trie,* 21 F.Supp.2d at 23, if the government discovers additional information related to these areas after providing Ms. Hsia with the bill of particulars required by

this Opinion, it may supplement its bill of particulars to include the new information.

SO ORDERED.